**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

CARLOS DOE, LUIS DOE, and GABRIEL DOE, on behalf of themselves and all others similarly situated,

    *Plaintiffs,*

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE); U.S. DEPARTMENT OF HOMELAND SECURITY (DHS); ALEJANDRO MAYORKAS, *under the title of Secretary of DHS*; PATRICK J. LECHLEITNER, *under the title of Acting Director of ICE*; RICARDO A. WONG, *under the title of ICE Deputy Assistant Director, Oversight Compliance and Acquisition Division*; MONICA S. BURKE, *under the title of ICE Acting Assistant Director of Custody Management*, BRITTANY TOBIAS, *under the title of ICE Contracting Officer*, and MARY DE ANDA-YBARRA, *under the title of ICE Field Office Director, El Paso Field Office*;

    *Defendants.*

No. 1:23-cv-971 MLG-JMR

**CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**INTRODUCTION** ...................................................................................................................1

**JURISDICTION AND VENUE** .............................................................................................2

**PARTIES** ................................................................................................................................3

   I.   Plaintiffs ..........................................................................................................................3

   II.  Defendants ......................................................................................................................4

**FACTUAL AND LEGAL BACKGROUND** ..........................................................................6

   I.   ICE Detention Facilities Must Comply With Federal Standards of Care To Receive Federal Funding .................................................................................................................................. 6

   II.  ICE Relied On A Lax Private Inspector To Conduct The Inspections For The Overall Performance Evaluations Required By The Two Strikes Mandate ............................................... 8

      A.   ICE Used Nakamoto To Conduct Overall Performance Inspections ............................ 8

      B.   Nakamoto Used Flawed And Unreliable Methods Permitting ICE To Avoid Giving Failing Evaluations .................................................................................................................. 9

   III. Despite Nakamoto's Flawed Inspection Process, TCDF Failed Its Overall Performance Evaluation In July 2021 Because of Its Grossly Inadequate Conditions .................................... 12

      A.   Nakamoto's July 2021 Inspection Revealed TCDF's Gross Failures To Meet Federal Standards ................................................................................................................................ 12

      B.   ICE Certified That TCDF Failed To Meet Federal Standards ..................................... 19

   IV. Grossly Inadequate Conditions Continued Following The 2021 Overall Performance Evaluation ................................................................................................................................. 19

      A.   ICE Scrambled To Avoid Documentation of A Second Consecutive Failure ............ 19

      B.   Despite ICE's Scrambling, TCDF Continued To Grossly Violate Federal Standards 21

   V.  The DHS Inspector General And ICE's Contracting Officer Found That TCDF Was Unhealthy, Unsafe, And Unfit For Continued Use ................................................................... 22

   VI. Less Than A Month After the Inspector General's And ICE Contracting Officer's Damning Findings, ICE Arbitrarily And Capriciously Certified That TCDF Passed the Follow-up Overall Performance Evaluation ........................................................................................................... 29

      A.   Nakamoto Ignored The Evidence And Recommended That ICE Certify TCDF As Compliant With The PBNDS .................................................................................................. 29

      B.   ICE Knew Or Should Have Known That Nakamoto's Findings Were Incorrect ....... 32

      C.   ICE Ignored The Contrary Evidence And Adopted Nakamoto's Recommendation, Certifying That The Facility Passed Its Follow-up Overall Performance Evaluation ........... 35

   VII. ICE's Increased Reliance On TCDF Directly Harms Detained Individuals ...................... 37

**CLASS ACTION ALLEGATIONS** .....................................................................................41

**CLAIMS FOR RELIEF** ......................................................................................................43

**PRAYER FOR RELIEF** .....................................................................................................46

**INTRODUCTION**

1.      Federal law mandates that U.S. Immigration and Customs Enforcement ("ICE") cancel its contract for any detention facility that fails two consecutive overall performance evaluations for compliance with federal detention standards (hereinafter, the "Two Strikes Mandate").

2.      In July 2021, the troubled Torrance County Detention Facility ("TCDF") in Estancia, New Mexico, failed its 2021 overall performance evaluation, based on, among other things, chronic and severe understaffing, and unsafe and unsanitary living conditions.

3.      Egregious conditions persisted when the time came for TCDF's next overall performance evaluation in March 2022. ICE knew this.

4.      For instance, on March 1, 2022, ICE's own Contracting Officer issued a scathing Contract Discrepancy Report about TCDF, critiquing TCDF's operator for "providing misleading and inaccurate" information to ICE; for "critically short" staffing; and for "numerous violations of uncleanliness, disrepair, and preventative maintenance." The report noted that ICE had "confirmed that the repeated violations noted since [] August 2021 are still occurring and jeopardize the TCDF overall operational capability."

5.      Likewise, on March 16, 2022, the U.S. Department of Homeland Security's ("DHS") Office of the Inspector General ("Inspector General") issued an unprecedented "Management Alert" to ICE, calling for the immediate removal from TCDF of all individuals detained there.  The Inspector General based this urgent recommendation on, among other things, "critical staffing shortages that have led to safety risks and unsanitary living conditions," including a lack of adequate access to drinking water, moldy and leaking sinks, broken toilets clogged with human waste, and vacant security posts.

6.      But ICE did not shut down the facility. Instead, just two weeks later, ICE's private contractor, the Nakamoto Group, Inc. ("Nakamoto"), conducted a deeply flawed, lax inspection for the follow-up overall performance evaluation and issued an inspection report recommending

that ICE give TCDF a passing rating. Then, on April 21, 2022, ICE adopted Nakamoto's recommendation and certified a passing evaluation based on that flawed inspection, thereby evading the Two Strikes Mandate. In doing so, ICE disregarded contrary findings from both its own Contracting Officer and DHS's Inspector General; accepted assertions in Nakamoto's report that it knew or should have known were untrue; and overlooked obvious, serious contradictions within that report.

7.      This complaint alleges that ICE violated Congress's Two Strikes Mandate by engineering the sham 2022 follow-up overall performance evaluation of TCDF and certifying that TCDF passed that evaluation.

8.      Because ICE's actions were arbitrary and capricious and evaded the Two Strikes Mandate Congress required, this Court should vacate and remand ICE's certification of the 2022 follow-up overall performance evaluation. On remand, ICE should be required to reverse its certification decision for the 2022 follow-up overall performance evaluation, unless it can provide a reasonable explanation for maintaining that decision.

9.      Plaintiffs are noncitizens currently detained by ICE at TCDF. They bring this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of all persons who are currently or will be detained by ICE at TCDF.

**JURISDICTION AND VENUE**

10.      This Court has jurisdiction over the claims alleged in this Complaint pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (Administrative Procedure Act).

11.      The United States' sovereign immunity is waived under 5 U.S.C. §§ 702 and 706.

12.      The Court has the authority to issue a declaratory judgment and grant the other requested equitable relief under 5 U.S.C. § 706, 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), and Federal Rules of Civil Procedure 57 and 65.

13.      Under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703, venue lies properly within the District of New Mexico because a substantial part of the events or omissions giving rise to

Plaintiffs' claims occurred within the District.

## PARTIES

### I.    Plaintiffs

14.    Plaintiff **Carlos Doe** is thirty-two years old and a citizen of Venezuela. Carlos is seeking protection in the United States after he opposed the Venezuelan government and was targeted and threatened for years. He has been detained at TCDF since approximately September 14, 2023. Starting approximately September 18, 2023, Carlos was held in medical isolation. While in medical isolation, Carlos went an entire day without access to drinking water. When he asked for water, the guards did not give him any. On many other occasions he has gone several hours without water despite his asking for water. From about September 18 to approximately October 16, 2023, when a medical professional intervened, Carlos was also denied any access to a shower, telephone calls, or outside recreation time. As of November 1, 2023, Carlos was still held in medical isolation and still unable to shower on the weekends.

15.    Plaintiff **Luis Doe** is twenty-six years old and a citizen of Venezuela. He is seeking protection in the United States after he was tortured by Venezuelan police for refusing to engage in illicit activities for corrupt officials. He has been detained at TCDF since approximately September 14, 2023. During his detention, Luis requested medical care for a severe headache; in response, he was told to fill out a form and did not receive any medical care for approximately four days. Luis has been given food that was spoiled or still frozen. He has observed clogged toilets and sinks, as well as broken showers, and often spends long periods of time waiting in line to use the shower within his housing unit because only a few showers are working. TCDF personnel promised Luis payment for participating in the cleaning of his housing unit's floor, tables, benches, bathrooms, and stairs with other detained individuals, but as of November 1, 2023, he has not been paid as promised for the days of work that he did. He has trouble sleeping because of the cold temperatures inside the facility and because he is anxious and worried due to the lack of information he and others receive from ICE about what to expect from their immigration cases or

how long they will be detained.

16.    [intentionally left blank][1]

17.    Plaintiff **Gabriel Doe** is forty years old and a citizen of Venezuela. He is seeking protection in the United States after receiving death threats in Venezuela due to his political beliefs. He has been detained at TCDF since approximately September 14, 2023. Gabriel is often thirsty because the guards do not provide enough drinking water for people in his housing unit. He receives insufficient food, and although he and other detained individuals have asked for more food on many occasions, the guards ignore their requests. He describes the food he does receive as often flavorless and not fully cooked. He often waits in a long line to be able to use one of the few working showers in his housing unit, which have only cold water. His bedsheets have not been cleaned since he arrived at TCDF. He feels that the guards treat him as if he were less than human, yelling at him and ignoring his most basic needs.

## II.    Defendants

18.    Defendant U.S. Department of Homeland Security ("DHS") is part of the Executive Branch of the U.S. government, and is headquartered in Washington, D.C. DHS is responsible for enforcing federal laws governing, among other things, border control and immigration.

19.    Defendant U.S. Immigration and Customs Enforcement ("ICE") is a component of DHS, headquartered in Washington, D.C., and is responsible for, among other things, detaining noncitizens who are in civil immigration proceedings and pending removal from the United States.

20.    Defendant Alejandro Mayorkas is sued in his official capacity as the Secretary of DHS. In this capacity, he directs each of the component agencies within DHS, including ICE. As a result, in his official capacity, Secretary Mayorkas's responsibilities include the administration and enforcement of immigration laws, including ICE officials' compliance with applicable statutes.

---

[1]    This Paragraph previously contained allegations related to a fourth pseudonymous plaintiff, Ernesto Doe, who was voluntarily dismissed from this case. *See* ECF No. 74. Plaintiffs have left this Paragraph blank so as to not alter paragraph numbering relied upon in subsequent briefing.

21.    Defendant Patrick J. Lechleitner is sued in his official capacity as the Deputy Director and Senior Official Performing the Duties of the Director (hereinafter "Acting Director") of ICE. Acting Director Lechleitner is responsible for enforcement and removal operations for ICE, including ICE's implementation of and compliance with the statutory prohibition against continuing any contract or expending funds to detain noncitizens at a detention facility that fails two consecutive overall performance evaluations.

22.    Defendant Ricardo A. Wong is sued in his official capacity as the ICE Deputy Assistant Director, Oversight Compliance and Acquisition Division. Deputy Assistant Director Wong's responsibilities include implementing and ensuring compliance with the statutory prohibition against continuing any contract or expending funds to detain noncitizens at a detention facility that fails two consecutive overall performance evaluations. Deputy Assistant Director Wong certified TCDF's compliance with ICE's detention standards in April 2022, permitting the continued use of TCDF to detain individuals in ICE custody despite substantial and repeated violations of the detention standards evident at the time of the follow-up overall performance evaluation.

23.    Monica S. Burke is sued in her official capacity as the ICE Acting Assistant Director of Custody Management. Acting Assistant Director Burke's responsibilities include implementing and ensuring compliance with the statutory prohibition against continuing any contract or expending funds to detain noncitizens at a detention facility that fails two consecutive overall performance evaluations. Acting Assistant Director Burke certified TCDF's compliance with ICE's detention standards in April 2022, permitting the continued use of TCDF to detain individuals in ICE custody despite substantial and repeated violations of the detention standards evident at the time of the follow-up overall performance evaluation.

24.    Brittany Tobias is sued in her official capacity as the ICE Contracting Officer responsible for the contract by which noncitizens in ICE custody are detained at TCDF. Contracting Officer Tobias's responsibilities include terminating the contract for ICE detention

services in a facility that fails two consecutive overall performance evaluations.

25.     Mary De Anda-Ybarra is sued in her official capacity as the Field Office Director for ICE's Enforcement and Removal Operations in the El Paso, Texas area of responsibility, which includes ICE operations in West Texas and New Mexico. Director De Anda-Ybarra's responsibilities include managing ICE's detention of noncitizens at TCDF.

## FACTUAL AND LEGAL BACKGROUND

I.     **ICE Detention Facilities Must Comply With Federal Standards of Care To Receive Federal Funding**

26.     TCDF is a detention facility in a remote location in Estancia, New Mexico, approximately a one-hour drive from Albuquerque, New Mexico.

27.     Facilities that detain noncitizens for ICE, including TCDF, must comply with minimum standards set forth by ICE. While ICE has issued several versions of these standards over time, the standards that ICE applies to TCDF are the Performance-Based National Detention Standards 2011, as revised in December 2016 (the "PBNDS").

28.     The stated purpose of ICE's standards is to ensure that detained individuals are treated "in the most humane manner possible" and receive "sound conditions and care." ICE, *Performance-Based National Detention Standards 2011* ("PBNDS"), https://tinyurl.com/mrxs8np2. The PBNDS aim to achieve this purpose by imposing basic minimum standards, including for environmental health and safety, personal hygiene, food service, medical care, visitation, and grievances. *See infra*.

29.     The PBNDS are organized into a three-level structure of sections, standards, and components.

30.     The seven PBNDS sections—Safety, Security, Order, Care, Activities, Justice, and Administration and Management—each include numerous specific standards that detention facilities must meet. For example, the Safety section requires detention facilities to comply with the Environmental Health and Safety standard, and the Care section requires detention facilities to comply with the Food Service and Medical Care standards.

31.     Each PBNDS standard, in turn, is subdivided into components that impose specific obligations. For instance, the Environmental Health and Safety standard includes a component requiring detention facilities to maintain environmental health conditions at a level that meets recognized standards of hygiene.

32.     ICE has designated certain components as "Priority" components because it deems them to be critically important to ensure that detained individuals are confined in adequate, safe, and secure conditions. For instance, a Priority component within the Care section's Food Service standard is that "sanitary guidelines" must be adhered to "[b]efore and during the display, service, and transportation of food" because it is critically important to ensure that detained individuals receive safe and healthy food.

33.     ICE has a "comprehensive annual inspection oversight program," which the agency originally developed in or around 2007, to evaluate detention facilities' compliance with ICE's minimum standards.

34.     In the spring of 2008, ICE came under public scrutiny because of serious concerns about the inadequacy of medical care in its detention system. In response, Congress held hearings to investigate detention conditions and the circumstances of medical care for detained individuals.

35.     Following these hearings, Congress passed the DHS Appropriations Act of 2009. That act included a provision barring ICE from funding contracts for detention facilities that fail two consecutive overall performance evaluations under ICE's annual inspection program. Specifically, Congress mandated:

> [N]one of the funds provided under this heading may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than "adequate" or the equivalent median score in any subsequent performance evaluation system.

Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Pub. L. No. 110-329, Div. D, Tit. II, 122 Stat. 3574, 3658–59 (2008).

36.     This requirement, herein referred to as the "Two Strikes Mandate," has been

reauthorized by Congress in every DHS appropriation to the present.[2]

## II.    ICE Relied On A Lax Private Inspector To Conduct The Inspections For The Overall Performance Evaluations Required By The Two Strikes Mandate

### A.  ICE Used Nakamoto To Conduct Overall Performance Inspections

37.    In 2007, ICE began contracting with Nakamoto, a private contractor, to inspect facilities that hold noncitizens in ICE custody for longer than 72 hours. From the time the Two Strikes Mandate took effect in 2009, up to and including the April 2022 certification of TCDF challenged here, ICE used Nakamoto to conduct the inspections for the overall performance evaluations of immigration detention facilities required by that mandate.[3]

38.    Nakamoto submitted a worksheet and a report to ICE about each inspection that it conducted for an overall performance evaluation. The worksheet included Nakamoto's rating for each component and standard. The report summarized how many PBNDS standards and components a facility met or failed to meet and provided a recommendation of whether ICE should assign the detention facility an overall rating of "Meets Standards" or "Does Not Meet Standards," as measured against its compliance with the PBNDS.

39.    ICE was the final decision-maker as to whether a detention facility inspected by Nakamoto passed the overall performance evaluation. For that reason, all overall performance recommendations generated by Nakamoto were treated as "drafts," which ICE reviewed for final approval and certification.

---

[2]    *See, e.g.*, DHS Appropriations Act of 2010, Pub. L. No. 111-83, Tit. II, 123 Stat. 2142, 2149 (2009); Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, Div. D, Tit. II, 125 Stat. 786, 949–50 (2011); Consolidated and Further Continuing Appropriations Act of 2013, Pub. L. No. 113-6, Div. D, Tit. II, 127 Stat. 198, 346–47; Consolidated Appropriations Act of 2017, Pub. L. No. 115-31, Div. F, Tit. II, § 211, 131 Stat. 135, 412; Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, Div. F, Tit. II, § 215(a), 134 Stat. 1182, 1457 (2020); Consolidated Appropriations Act of 2022, Pub. L. No. 117-103, Div. F, Tit. II, § 215(a), 136 Stat. 49, 322–23 (2022); Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, Div. F, Tit. II, § 214(a), 136 Stat. 4459, 4736 (2022).

[3]    It is Plaintiffs' understanding that ICE no longer contracts with Nakamoto to perform overall performance evaluation inspections. However, Nakamoto did conduct the relevant 2021 and 2022 overall performance evaluation inspections here.

40.    ICE occasionally uses technical assistance reviews ("TARs") to identify outstanding deficiencies that a detention facility would need to fix before an overall performance evaluation. Nakamoto also conducted TARs, though they did not result in a final rating for the facility.

### B. Nakamoto Used Flawed And Unreliable Methods Permitting ICE To Avoid Giving Failing Evaluations

41.    ICE has avoided terminating detention contracts under the Two Strikes Mandate by relying on Nakamoto's overall performance recommendation despite its knowledge that Nakamoto's process for inspecting facilities was deeply flawed, including because it was superficial, easy to game, and overly permissive, thus allowing even unsafe, poorly performing detention facilities to pass.

42.    In June 2018, the Inspector General documented numerous ways ICE's inspection system was overly permissive, specifically highlighting issues with many of Nakamoto's procedures and practices. *See* DHS Off. of Inspector Gen., *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systematic Improvements* (2018), https://tinyurl.com/3h5zk6zx ("DHS OIG Inspections and Monitoring Report").

43.    For instance, "[s]everal ICE employees in the field and managers at ICE [Enforcement and Removal Operations ("ERO")] headquarters commented that Nakamoto inspectors 'breeze by the [PBNDS] standards' and do not 'have enough time to see if the [facility] is actually implementing the policies.'" *Id*. at 7 n.12. These officials also "described Nakamoto inspections as being 'very, very, very difficult to fail.'" *Id*. "One ICE ERO official suggested these inspections are 'useless.'" *Id*.

44.    The Inspector General also identified other concerns with the inspection procedures, including the announcement of inspections for overall performance evaluations to the facility in advance, the failure to verify representations by ICE personnel and detention facility staff, the failure to conduct proper interviews with detained individuals, and ICE's practice of granting waivers for facilities with deficient conditions. *Id*. at 6–10. ICE's own field staff have

9

acknowledged that the advance notice of inspections "allows facility management to temporarily modify practices to 'pass' an inspection." *Id*. at 10.

45.    The Inspector General also found that ICE's Statement of Work ("SOW") for contracted detention facility inspections has not provided inspectors with clear procedures for inspecting detention conditions, and that Nakamoto's inspection practices "fell short of" the SOW's requirements. *Id.* at 6.[4] Specifically, the SOW requires that inspectors observe and validate "the actual conditions at the facility." *Id.* The Inspector General found that some Nakamoto inspectors merely "relied on brief answers from facility staff and merely reviewed written policies and procedures instead of observing and evaluating facility conditions." *Id.* at 6–7. The Inspector General reported that "[s]ome inspectors did not consistently look at documentation to substantiate responses from staff or ensure the facility was actually implementing the policies and procedures." *Id.* at 7.

46.    The SOW also requires inspectors to interview detained individuals who do not speak English, but the Inspector General did not observe Nakamoto inspectors conducting any interviews in a language other than English, nor any interviews in which inspectors used interpretation services. *Id.* at 8. In fact, the Inspector General observed that inspectors selected people for interviews by first asking whether they spoke English. *Id.*

47.    The SOW also requires that interviews include "private conversations with individual detainees (in a confidential area)," but the Inspector General did not observe any interviews taking place in private settings. *Id.* Inspectors had "brief, mostly group conversations with detainees in their detention dorms or in common areas in the presence of detention facility personnel, generally asking four or five basic questions about treatment, food, medical needs, and opportunities for recreation." *Id.* The Inspector General found that these limited group discussions are not consistent with the SOW requirements. *Id.*

---

[4]  ICE's Statement of Work referenced herein sets forth a contractor's responsibilities in inspecting ICE detention facilities.

48.     The Inspector General also "identified inaccuracies in Nakamoto's summary reports and checklists," and determined that "[i]n some instances, Nakamoto's reports misrepresented the level of assurance or the work performed in evaluating the actual conditions of the facility and the information in the reports was inconsistent with what [the Inspector General] observed during inspections." *Id.* at 9.

49.     In September 2020, the House Homeland Security Committee made similar findings. It warned that Nakamoto "has demonstrated a lack of credibility and competence" and was "ill-equipped" for its oversight work. *See* U.S. House of Rep. Comm. on Homeland Security, *ICE Detention Facilities: Failing to Meet Basic Standards of Care* at 7–8 (Sept. 21, 2020), https://tinyurl.com/fu5n7cyx ("House Report"). Among other things, "Nakamoto's inspections . . . are too broad and too brief to effectively examine the conditions at detention facilities," *id.* at 7, and there was "a pattern of Nakamoto inspectors relying on what they are told by ICE officials and facility contractors rather than examining the evidence themselves." *Id.* at 9.

50.     The House Report also recounted testimony by Nakamoto personnel acknowledging that Nakamoto had no process in place to ensure that a fluent Spanish speaker was on each inspection team to interview monolingual Spanish speakers. *Id.* at 9. Shockingly, "[w]hen asked how they ascertain that an employee is fluent in Spanish, Nakamoto's Chief Operating Officer responded that he knows [an employee] is fluent by his or her ethnicity and last name." *Id.* Of course, many people who have a last name associated with a Hispanic ethnic group do not speak Spanish, just as many people who do not have a last name associated with a Hispanic ethnic group do speak Spanish.

51.     Because of these and other flawed processes and deficiencies, a Nakamoto finding that a detention facility complies with the PBNDS is inherently unreliable, while a Nakamoto finding that a detention facility does not comply with the PBNDS is particularly alarming.

52.     For this reason, the 2021 Appropriations Act now requires that ICE itself conduct overall performance evaluations of its detention facilities. *See* Consolidated Appropriations Act of

11

2021, Pub. L. No. 116-260, Div. F, Tit. II, § 215(b), 134 Stat. 1182, 1457 ("Beginning not later than January 1, 2021, the performance evaluations referenced in subsection (a) shall be conducted by the U.S. Immigration and Customs Enforcement Office of Professional Responsibility.").

53.    Nevertheless, at least through April 2022, ICE continued to rely on Nakamoto to conduct inspections for its overall performance evaluations of detention facilities. ICE's Office of Professional Responsibility ("OPR"), in contrast, conducted only ad hoc inspections of a handful of facilities each year through its Office of Detention Oversight ("ODO"), evaluating compliance with only a subset of requirements of the PBNDS.

### III.    Despite Nakamoto's Flawed Inspection Process, TCDF Failed Its Overall Performance Evaluation In July 2021 Because of Its Grossly Inadequate Conditions

54.    In May 2019, after a period of about a year and a half when TCDF had laid vacant, ICE decided to begin detaining noncitizens there. CoreCivic, Inc. ("CoreCivic"), a private prison company, operates TCDF.[5]

55.    By summer 2021, TCDF was dangerously understaffed and was failing to provide a safe living environment to detained individuals. The grossly and obviously inadequate conditions caused TCDF to fail its 2021 overall performance evaluation, as recommended by Nakamoto in its inspection report and adopted and certified by ICE itself.

### A.    Nakamoto's July 2021 Inspection Revealed TCDF's Gross Failures To Meet Federal Standards

56.    From July 27 to July 29, 2021, ICE's contractor, Nakamoto, conducted an annual inspection of TCDF for its overall performance evaluation to assess its compliance with the

---

[5]  ICE elected to detain noncitizens in this facility run by CoreCivic despite CoreCivic's disturbing history of understaffing its prisons, as confirmed by jury verdicts and federal and state audits. To name only a few examples, in 2017 alone: (1) a federal jury found that CoreCivic had understaffed an Idaho prison and was deliberately indifferent to the risk of serious harm that understaffing posed to inmates, (2) the U.S. Department of Justice Office of the Inspector General slammed CoreCivic for severe understaffing at a Kansas maximum-security facility that jeopardized detained individuals' safety, security, and access to healthcare, and (3) the Tennessee Comptroller of the Treasury's office found that CoreCivic kept incomplete or false staff records and did not hire enough people to supervise inmates in two Tennessee prisons.

PBNDS. TCDF received at least one month's advance notice of the inspection and told its staff to put their best foot forward by "paying attention to the little things and ensur[ing] [their] areas are ready for inspection."

57.     Even with notice far in advance for an inspection conducted by a notoriously lax contractor, Nakamoto still found that TCDF grossly violated the PBNDS. In its report documenting the inspection, Nakamoto recommended that ICE rate the facility as "Does Not Meet Standards."

58.     Nakamoto's July 2021 inspection report for TCDF's overall performance evaluation, attached hereto as **Exhibit 1**, revealed damning failures. TCDF was dangerously understaffed. The few available personnel were overworked and the manager responsible for training them had not been properly trained. And the facility was failing at two of its most basic tasks: providing a safe and sanitary food service and providing safe and hygienic living conditions to detained individuals. Moreover, Nakamoto found that the facility was failing to keep track of detained individuals' grievances. The scale of these failures was broad: Nakamoto found that TCDF did not meet PBNDS requirements for 22 components across 8 standards, and completely failed to meet the Food Service standard, which alone had 12 deficient components. Five of the 22 components that TCDF failed were "Priority" components, which ICE has deemed critically important to ensuring detained individuals' safety and security.

59.     ***Deficient Staffing and Training***. The PBNDS require TCDF to develop and implement a "comprehensive staffing analysis and staffing plan" and maintain appropriate staffing for security, monitoring of detained individuals, and medical and mental health services. PBNDS at 81–82, 151, 257, 261.

60.     Nakamoto's July 2021 inspection report found that TCDF was severely understaffed. Only 50% of correctional and security positions were staffed, which forced staff to work mandatory overtime shifts. Ex. 1 at 3. Compounding this problem, the manager responsible for training the overworked existing staff members at TCDF had not themselves been properly trained.

61.    These deficiencies were not new. Rather, Nakamoto's July 2021 inspection report confirmed that staffing and training deficiencies that ICE had known about since late 2020 remained uncorrected. Nakamoto identified lack of proper training as "a repeat deficiency" from its prior inspection report for the October 2020 overall performance evaluation. Ex. 1 at 2. And a pattern of chronic understaffing was regularly documented at TCDF from late 2020 through the date of the inspection. In December 2020, ICE's Contracting Officer found that TCDF was severely understaffed, in violation of the PBNDS, for multiple reasons, including that "facility medical staffing is not in line with the agreed upon contractual staffing plan," "the facility has critical medical staffing shortages," and "the Chief Medical Officer has not been dedicated to the Torrance contract and … [provided] very limited coverage."[6] ICE also recognized in December 2020 that these deficiencies put TCDF in violation of the PBNDS Medical Care standard. *See* PBNDS at 252–281, https://tinyurl.com/mrxs8np2. In response, TCDF acknowledged that it was violating staffing requirements, had not been able to fill vacant positions in a timely manner, and that it was "impossible to make guarantees when positions will be filled." ICE also knew even before Nakamoto's July 2021 inspection report that other staffing areas had "critical[] shortages," that 31% of required staff positions were vacant as of May 2021, and that TCDF's proposals for adjusting staffing were inadequate.

62.    ***Unsafe and Unhealthy Food Service***. The PBNDS Food Service standard aims to ensure "that detainees are provided a nutritionally balanced diet." PBNDS at 228, https://tinyurl.com/mrxs8np2. All people detained by ICE at TCDF must be provided: (1) "nutritionally balanced diets that are reviewed at least quarterly by food service personnel and at least annually by a qualified nutritionist or dietitian"; and (2) "appetizing meals" that "accommodate the ethnic and religious diversity of the facility's detainee population." *Id*. The

---

[6]    In addition to the overall performance evaluations for PBNDS compliance, ICE contracting officers evaluate detention facilities' compliance with the PBNDS, which are incorporated into each ICE detention facility contract. Those officers have the authority to penalize facilities that fail to comply with the PBNDS.

PBNDS further require the food service to follow "sound safety and sanitation practices" to prevent "injury and illness," as well as to "meet established governmental health and safety codes." *Id.*

63.    Nakamoto's July 2021 inspection report found that TCDF failed the Food Service standard altogether and that TCDF was failing to "ensure a safe, sanitary, and hygienic food service operation." Ex. 1 at 4. To name just a few examples from the 12 deficient components, food was left exposed to pests and/or environmental contaminants, thermometers were not sanitized, and kitchen equipment was visibly rusting out and had not been cleaned. Nakamoto even found that TCDF was failing to properly wash dishes and that the dishwasher temperature was so low it was not killing pathogens. *Id.* at 4. As a result, the inspection report detailed "numerous instances of [food] sanitation and safety concerns," including "issues with food display and service; food preparation; food protection; and safety and sanitation." *Id.* Compounding these failures, Nakamoto found that TCDF and its food service sub-contractor had failed to establish ***any*** food sanitation and security standards.

64.    TCDF's wholesale failure of the PBNDS Food Service standard in July 2021 was particularly striking given the facility's history of deficient food service. For instance, detained individuals previously informed ODO that the food was "cold, flavorless, and the portions were too small. Likewise, Nakamoto had previously reported that there "was a general dislike for the food [at TCDF], i.e. watery rice, mushy potatoes, bad lettuce, no meat, etc."

65.    ***Environmental Health and Safety Deficiencies***. The PBNDS Environmental Health and Safety standard aims to "protect[] detainees, staff, volunteers, and contractors from injury and illness by maintaining high facility standards of cleanliness and sanitation," among other things. PBNDS at 19, https://tinyurl.com/mrxs8np2. This standard sets forth several expected outcomes and practices, including that "[f]acility cleanliness and sanitation shall be maintained at the highest level"; that environmental health conditions shall meet recognized standards of hygiene set by the American Correctional Association, the Occupational Safety and Health Administration, and other standard-setters; and that all detained individuals shall have access to safe drinking water.

15

*Id*. at 19–20. To ensure these outcomes are met, the PBNDS require regular sanitation efforts such as cleaning horizontal surfaces with approved germicidal solutions, daily cleaning of furniture and fixtures, and daily mopping with "a hospital disinfectant-detergent solution" and "a clean mop head." *Id*. at 21. Further, related medical care and personal hygiene standards require that detained individuals "have access to operable washbasins with hot and cold running water … [and] operable toilets and hand-washing facilities." *Id*. at 265; *see also id*. at 329.

66.    Nakamoto's July 2021 inspection report found that TCDF fell well "below [] recognized safety and hygiene standards" set by the American Correctional Association, the Food and Drug Administration, and other standard-setters. In short, Nakamoto observed that both housing units and common areas were filthy—"housing units' floors and bathroom areas were in need of cleaning, as was the food service and the barbershop." *Id*. These unhygienic conditions were particularly glaring in the food service department's restrooms designated for detained individuals. In those restrooms, Nakamoto observed, "floors, sinks, and toilets were in need of cleaning," and detained individuals could not even wash their hands to eat safely because "there was no hand soap and hot water was not readily available."

67.    These issues were not new. For instance, during the early months of the COVID-19 pandemic, TCDF failed to provide detained individuals with adequate supplies of masks, cleaning supplies, and hand soap; inform them about COVID-19 precautions; or allow them to engage in social distancing. In May 2020, detained individuals began a peaceful hunger strike to express concern about these insufficient precautions. Rather than correct these deficiencies and follow the PBNDS, TCDF personnel attacked the hunger-striking individuals with oleoresin capsicum spray (also known as pepper spray) in a confined space, and failed to properly decontaminate the affected individuals, resulting in continued harm for days after the attack.[7] Even after that incident, detained

---

[7] This incident is further detailed in the detained individuals' state court lawsuit. *See* Am. Compl. for Declaratory Relief and Damages, *Santa Fe Dreamers Project et al. v. CoreCivic, Inc.*, No. D-722-CV-2021-00055 (N.M. Seventh Jud. Dist. Feb. 15, 2022). This lawsuit has since been resolved.

individuals continued to raise concerns about sanitation and safety, including informing Nakamoto in late 2020 that "the bathrooms were dirty because the detained individuals could not get the proper cleaning supplies."

68.    ***Deficient Medical Service***. The PBNDS Medical Care standard aims to ensure that detained individuals "have access to appropriate and necessary medical, dental and mental health care." PBNDS at 257, https://tinyurl.com/mrxs8np2. This standard lays out several expected outcomes, including that "[d]etainees shall be able to request health services on a daily basis and shall receive timely follow-up," and "shall be transferred in a timely manner to an appropriate facility" if the facility in which they are detained cannot meet their healthcare needs. *Id*. at 257–258. Additionally, it requires that a physician be "on call 24 hours per day," and "health care personnel are on duty 24 hours per day when patients are present." *Id.* at 265. It also requires "an on-call physician, dentist, and mental health professional, or designee, that are available 24 hours per day" for emergency services. *Id*. at 272.

69.    Nakamoto's July 2021 inspection report documented that multiple detained individuals reported to Nakamoto that "they submitted sick call slips and had not been seen by medical staff." Ex. 1 at 3. Nakamoto further found that, in one case, medical grievances filed by a detained individual and a grievance disposition were missing from the detained individual's file. These interviews and findings indicated that TCDF had failed to remedy the deficiencies in medical care previously identified by ICE, including the "critical medical staffing shortages" at TCDF that "place[d] in question [its] operational capability."

70.    ***Denial of Visitation to Indigent Detained Individuals***. The PBNDS provide a standard for visitation, which is intended to "ensure[] that detainees shall be able to maintain morale and ties through visitation with their families, the community, legal representatives and consular officials, within the constraints of the safety, security and good order of the facility." PBNDS at 392, https://tinyurl.com/mrxs8np2. To meet this standard, "[f]acilities are encouraged to allow detainees to maintain ties to their family and friends in the community," and "to provide

opportunities for both contact and non-contact visitation with approved visitors during both day and evening hours." *Id.*

71.    Nakamoto's July 2021 inspection report found that TCDF was violating the PBNDS by depriving indigent detained individuals of any opportunities for visitation with their friends and families. The PBNDS provide that visitation "shall be limited only by the reasonable constraints of space, scheduling, staff availability, safety, security and good order," and do not authorize detention facilities to bill detained individuals for visitation. PBNDS at 392, https://tinyurl.com/mrxs8np2. But not only did TCDF eliminate in-person visitation due to COVID-19 concerns, it also imposed an additional unauthorized restriction by requiring detained individuals to pay for video visitation.

72.    The improper visitation restrictions Nakamoto found were a repeat issue at TCDF. For example, Nakamoto previously found in October 2020 that TCDF had restricted the number of visitors and length of visits because it was chronically understaffed.

73.    ***Grievance System Deficiency***. The PBNDS also contain a standard regarding the grievance system, which is intended to "protect[] a detainee's rights and ensure[] that all detainees are treated fairly by providing a procedure for them to file both informal and formal grievances." PBNDS at 414, https://tinyurl.com/mrxs8np2. The standard provides that any such grievances "relating to any aspect of" detention, including medical care, "shall receive timely responses." *Id.*

74.    Nakamoto's July 2021 inspection report found that TCDF was failing to keep proper records of detained individuals' grievances. Specifically, as noted above, the report found that, in one case, medical grievances filed by a detained individual and a grievance disposition were missing from the detained individual's file. Ex. 1 at 5. This finding was especially concerning because Nakamoto had previously found that detained individuals had filed numerous staff misconduct grievances in 2020, more than half of which were substantiated in the detained individual's favor.

75.    ***Nakamoto's Overall Recommendation***. Based on these and other myriad and grave

violations of the PBNDS, Nakamoto was forced to conclude that TCDF should fail the 2021 overall performance evaluation.

76.    The fact that TCDF managed to fail Nakamoto's inspection for the 2021 overall performance evaluation is striking given Nakamoto's well-documented reputation for lax and flawed inspection procedures. *See supra* ¶¶ 41–53. Yet the violations at TCDF were so blatantly egregious that TCDF failed even Nakamoto's notoriously lenient inspection.

77.    Nakamoto recommended to ICE that TCDF be rated as "Does Not Meet Standards" because it "does not comply with the … PBNDS." Ex. 1 at 5.

### B.  ICE Certified That TCDF Failed To Meet Federal Standards

78.    On August 25, 2021, in a memo attached hereto as **Exhibit 2**, Defendants Burke and Wong adopted Nakamoto's recommendation and certified that TCDF had failed its 2021 overall performance evaluation. *See* Ex. 2.

## IV.  Grossly Inadequate Conditions Continued Following The 2021 Overall Performance Evaluation

### A.  ICE Scrambled To Avoid Documentation of A Second Consecutive Failure

79.    Under the Two Strikes Mandate, ICE could not use the facility if it failed its next overall performance evaluation. As Defendants Burke and Wong advised ICE's El Paso Field Office on August 25, 2021, "ICE will have **no choice** but to immediately discontinue use of the facility and remove all detainees" if it failed again. Ex. 2.

80.    This situation placed ICE in a bind, as it faced pervasive, persistent problems at the facility—problems of which both ICE and TCDF were already well aware but that the facility had not fixed. Accordingly, ICE began smoothing the path for assigning TCDF a passing rating in its next overall performance evaluation even if the actual conditions on the ground did not improve.

81.    In the wake of the failed overall performance evaluation, Defendants Burke and Wong directed ICE's El Paso Field Office to provide TCDF with advance notice of Nakamoto's inspection for the follow-up overall performance evaluation. Ex. 2. Defendants Burke and Wong issued this directive even though the DHS Inspector General had determined that providing

advance notice of inspections was inappropriate because it "allows facility management to temporarily modify practices to 'pass' an inspection." DHS OIG Inspections and Monitoring Report at 10, https://tinyurl.com/mrxs8np2.

82.    Internal communications from ICE further demonstrate that TCDF's subsequent reported compliance with the PBNDS was a *fait accompli* long before Nakamoto actually conducted the inspection for the follow-up overall performance evaluation in March 2022. On October 26, 2021, an ICE official sent an email to colleagues identifying TCDF as one of three ICE detention facilities that failed an overall performance evaluation but then passed its follow-up overall performance evaluation—almost six months *before* TCDF's follow-up overall performance evaluation even began. The ICE official let slip ICE's preconceived plan just one week after Juan Acosta, then-Field Office Director for ICE's Enforcement and Removal Operations in El Paso, Texas, personally visited TCDF for two days and documented ongoing deficient conditions that needed to be "corrected 'on the spot'" before the next overall performance evaluation occurred.

83.    ICE also arranged for Nakamoto to conduct a "Technical Assistance Review" ("TAR") of TCDF on November 2–4, 2021, several months before the follow-up overall performance evaluation. The TAR, however, did not substantively address the 22 deficient components in food service, environmental health and safety, staff training, and other subjects identified in the 2021 overall performance evaluation, nor the specific corrective measures the facility had purportedly adopted to address those deficiencies. Instead, the TAR papered the record by making it appear that the facility had purportedly made progress since its July 2021 failed evaluation. For example, Nakamoto claimed in the November 2021 TAR report that the facility had "corrected" the sanitation problems identified in the 2021 overall performance evaluation and had been making "a concerted effort to recruit and maintain staff." Nakamoto asserted in a conclusory manner that TCDF could pass the next overall performance evaluation if the facility "continue[d] the corrected practices."

84.    Finally, when a facility fails an annual overall performance evaluation, it undergoes

a 180-day follow-up overall performance evaluation. However, ICE pushed back the date of TCDF's follow-up overall performance evaluation from January to late March 2022, more than 240 days after the failed 2021 inspection, giving TCDF even more time to address deficiencies and prepare for re-inspection.

### B. Despite ICE's Scrambling, TCDF Continued To Grossly Violate Federal Standards

85.    Despite ICE's efforts to avoid documentation of a second consecutive failure, from late 2021 onwards outside reports began to confirm that the actual conditions at TCDF remained grossly inadequate and were not being corrected.

86.    *First,* ICE alerted TCDF in September 2021 that there was a "severe lack of staffing and overall operational capability of the facility," and that staffing shortages were "leaving detainees unattended." ICE further documented its concern that TCDF's efforts to increase staffing were ineffective. ICE's comments demonstrate its awareness that, notwithstanding the rosy picture Nakamoto attempted to paint in the TAR report, TCDF was still falling short of the PBNDS.

87.    *Second*, on November 16–18, 2021, just two weeks after Nakamoto conducted its Technical Assistance Review at TCDF, ICE's own Office of Detention Oversight conducted an ad hoc inspection of TCDF's compliance with a narrower subset of the PBNDS. ODO found 21 deficiencies across 4 standards—more than double the number of deficiencies ODO's previous inspection had found and comparable to the number of deficiencies identified in Nakamoto's July 2021 inspection report. ODO identified concerning deficiencies in the protection of detained individuals' health and well-being. These deficiencies included failing to promptly screen individuals for tuberculosis and review their health assessments to determine treatment priority, and not requiring proper reporting of sexual abuse and assault allegations. ODO also flagged an insufficient approach to suicide prevention and intervention, reporting that TCDF's administrator did not appear to have reviewed TCDF's "Suicide Precaution/Close Observation" post orders and that a detained individual told ODO that he wanted to harm himself and felt he would not receive adequate treatment. Further, ODO highlighted that TCDF was restricting detained individuals'

access to the outside world, this time by failing to advise detained individuals of their right under the PBNDS to place domestic phone calls at no expense upon being transferred to TCDF and of how to label correspondence as legal mail. *See* PBNDS at 459, https://tinyurl.com/mrxs8np2.

88.     The ICE staffing alert and ODO report further demonstrated that Nakamoto's Technical Assistance Review was deficient. For example, despite taking place within weeks of the ODO inspection, the TAR made zero mention of deficiencies in suicide or sexual assault prevention. Indeed, the numerous deficiencies observed by ODO—when ODO investigated only a *subset* of standards—revealed that the TAR's claim that TCDF had "corrected [its] practices" was simply incorrect.

## V.    The DHS Inspector General And ICE's Contracting Officer Found That TCDF Was Unhealthy, Unsafe, And Unfit For Continued Use

89.     In February and March 2022, independent findings by DHS's Inspector General and ICE's own Contracting Officer confirmed beyond any doubt that TCDF remained an unsafe, unhealthy, and dangerous environment that was wholly unfit for continued use.

90.     From February 1–3, 2022, inspectors working for DHS's Inspector General conducted an unannounced, in-person inspection of TCDF. ICE personnel were present during the inspection. The Inspector General found egregious conditions at TCDF and promptly shared them with ICE, including during a February 3, 2022, close-out briefing. On February 4, 2022, ICE reported that the Inspector General had found very poor conditions, including "unhealthy conditions, staff shortages, and detainees in segregation who had not been let out for a week."

91.     On March 1, 2022—less than one month after the DHS Inspector General's inspection—the ICE Contracting Officer for TCDF issued a report, attached hereto as **Exhibit 3**, concluding that TCDF was in "on-going'" violation of its obligations under the PBNDS. *See* Ex. 3 at -003. The Contracting Officer found that TCDF was "critically short staff[ed]," was not "provid[ing] a safe environment for staff and noncitizens," and was failing to provide the "security … and care necessary to ensure proper facility maintenance, overall cleanliness, and personal hygiene needs described in the PBNDS." *Id*.

22

92.     On March 7, 2022, TCDF's operator responded to the ICE Contracting Officer. While acknowledging that the facility had failed to fill staffing vacancies, the response claimed that the November 2021 TAR and ODO reports showed that TCDF was meeting detained individuals' needs. *Id*. at -006–7.

93.     On March 9, 2022, the ICE Contracting Officer rejected the TCDF operator's response to the notice of violation for "not addressing [ICE's] concerns" and "providing misleading and inaccurate response information." *Id*. at -004. The Contracting Officer specifically rejected the response's reliance on Nakamoto's Technical Assistance Review and the ODO report. As the Contracting Officer explained, this "increasing[] level of outside inspections[] would not be occurring if the TCDF was being properly operated" and that "recent inspections have confirmed that the repeated violations noted since … August 2021 are still occurring." *Id*. at -005.

94.     On March 16, 2022, the DHS Inspector General issued an urgent and unprecedented "Management Alert" to ICE, attached hereto as **Exhibit 4**, ***"recommend[ing] the immediate relocation of all detainees from the facility***" due to "egregious conditions." Ex. 4 at 2–3 (emphasis added). The Inspector General found that "critical staffing shortages [] have led to safety risks and unsanitary living conditions," and breaches of TCDF's obligations to "ensure detainees reside in a safe, secure, and humane environment." *Id*. at 1–2.

95.     On March 23, 2022, ICE determined that the deficiencies its Contracting Officer identified were serious enough to warrant a penalty and decided to deduct an additional 15% from ICE's monthly contractual payments for TCDF on top of previously imposed penalties. Ex. 3 at -001–2. Consistent with the Contracting Officer's findings, ICE determined that TCDF was committing "on-going … violations" of the PBNDS. *Id*. at -001.

96.     The Inspector General's unannounced inspection and Management Alert, as well as ICE's own Contracting Officer's report and penalty, demonstrated that as of March 2022, TCDF was critically understaffed, unhealthy, and unsafe, as detailed below.

97.     ***Critical staffing shortages***. The Inspector General found that TCDF was critically

understaffed and that there were a staggering 112 vacancies, comprising 46% of all positions. Ex. 4 at 3. The Inspector General concluded that ICE and the facility had been on notice of this problem since December 2020 but had failed to correct it. *Id*. ICE's Contracting Officer reached a similar conclusion just weeks later, reporting that less than half of positions were filled and that in security positions the fill rate was shockingly low—only 19%. Ex. 3 at -005. ICE's Contracting Officer also concluded that TCDF's attempts to fix the understaffing problem had failed: they had not "produced any tangible results" since December 2020, and "there is no indication" that they would do so going forward. *Id*. Importantly, both the Inspector General and the ICE Contracting Officer concluded that severe, chronic understaffing made the facility unsafe. As the ICE Contracting Officer found, understaffing was "directly responsible for the breakdown in the overall operational capabilities of the TCDF" and "safety, security and care [were] all at risk, [and] have been on-going violations." *Id.* at -003.

98.    ***Filthy, unhealthy, and unsanitary conditions***. The Inspector General concluded that TCDF—far from having improved sanitation since the 2021 failed overall performance evaluation—was still "expos[ing] staff and detainees to ***excessive*** and avoidable unsanitary conditions." Ex. 4 at 4 (emphasis added). After inspecting all 157 cells that held detained individuals at the time, the Inspector General found that 83 of them had unsanitary plumbing, "including toilets and sinks that were inoperable, clogged, or continuously cycling water." *Id.* The Inspector General documented "mold and water leaks throughout the facility" which "exacerbate unsanitary conditions and can lead to slip and falls by detainees or facility staff" and other health issues," as well as "faucets with missing cold and hot water buttons, and in some instances [] faucets [which] did not produce hot water." *Id*. at 4–5. The Inspector General found that "[b]roken sinks in facility housing units[], as well as water fountains, restricted from use due to COVID-19, resulted in detainees obtaining their drinking water from a communal area faucet intended for filling mop buckets." *Id.* The Inspector General further found that the facility was failing to promptly correct these "avoidable" problems and that work orders "went unresolved for 12 or more

days." *Id*. at 4–5.

99.    The Inspector General's alert included photographs taken by inspectors showing the squalid conditions at TCDF. Certain of these photographs are reproduced below and display the mold, leaks, and accumulated human waste that TCDF allowed and permitted to remain uncorrected.



**Figures 1 and 2. A Non-Functioning, Moldy Sink (left) and a Clogged Toilet Full of Human Waste (right) Observed in Vacant Cells in an Occupied Housing Unit**

*Source:* DHS OIG photos



**Detainee Cell Sink with Missing Hot Water Button**

*Source:* DHS OIG photos




**Figures 5 and 6. Leaking Detainee Cell Sink and Toilet, with Floor Mold in a Vacant Cell Located in an Occupied Housing Unit (left) and Housing Unit Ceiling Mold from Leaks (right)**

*Source:* DHS OIG photos

100.    ICE's Contracting Officer likewise found that TCDF was filthy and unsanitary. The Contracting Officer found that TCDF was violating the PBNDS due to "uncleanliness, disrepair, and preventative maintenance issues *in all living pods*," including "clogged, broke, and dirty toilets, wash basins, showers, and drinking fountains," and a lack of "[s]afe potable water." Ex. 3

26

at -004 (emphasis added). The Contracting Officer concluded that TCDF had failed "to provide …

[the] care necessary to ensure proper facility maintenance, overall cleanliness, and personal

hygiene needs," and that as a result TCDF was not "a safe environment for staff and noncitizens."

Ex. 3 at -003.

101.    ***Unsafe and insecure conditions***. To ensure facility safety, security, and good order,

the PBNDS require that security officer posts be located in or immediately next to detained

individuals' housing units, because officers are required to personally interact with detained

individuals and quickly respond to emergencies. PBNDS at 86, https://tinyurl.com/mrxs8np2.

Further, the facility must also staff a secure control center at all times to monitor and coordinate

facility security, safety, and communication systems. *Id*. at 82.

102.    The Inspector General found that, due to "Security Lapses throughout the Facility,"

detained individuals were living in an "unsafe and unsecure environment." Ex. 4 at 6–7.

Specifically, the Inspector General concluded that TCDF "did not properly supervise and monitor

detainees in the housing units" and frequently could not even observe detained individuals due to

understaffing and poor sight lines from control rooms. *Id.* One detained individual "corroborated

this unsafe and unsecure environment," telling the inspectors that he felt he would be "unable to

get the attention of staff in the event of an emergency." *Id*. As an example, the Inspector General's

report included photographs of a control room "without Posted Officers … and with Poor Sight

Lines through Barred and Dirty Windows," as reproduced below.

 

**Figures 7 and 8. Detainee Housing Unit Control Room without Posted Officers (left) and with Poor Sight Lines through Barred and Dirty Windows (right)**
*Source:* DHS OIG photos

*Id.* at 7.

103.    ICE's Contracting Officer similarly found that TCDF's "continued [security] lapses … are directly putting staff and detainees in direct harm." Ex. 3 at -004. The Contracting Officer found that, because of severe understaffing, many security positions were "unmanned," and that detained individuals were "left unattended for extended periods of time without any direct supervision." *Id*. The Contracting Officer further concluded that TCDF had shown that it was unable to "provide the necessary security" for staff and detained individuals. *Id*. at -003.

104.    Rather than adhering to the Inspector General's urgent recommendation to immediately remove detained individuals from an unhealthy, unsafe, and dangerous environment, or correcting TCDF's glaring ongoing PBNDS violations, ICE leadership buried their heads in the sand and obfuscated. On March 7, 2022, ICE's then-Acting Chief of Staff, Jason Houser, wrote to the Inspector General to dispute the Inspector General's findings of unsanitary conditions and understaffing at TCDF, and even accused the Inspector General of "ignor[ing] facts … to achieve preconceived conclusions." Ex. 4 at 13.

105.    Yet as the Inspector General detailed in the Management Alert, Mr. Houser's

denials were in "direct conflict with" the findings of ICE's own Contracting Officer. Ex. 4 at 9, 11.

For instance, while Mr. Houser claimed staffing was "appropriate for th[e] lower number of

detainees" that TCDF housed, *id*. at 14, ICE's Contracting Officer found the exact opposite—that

understaffing was "directly responsible for the breakdown" at TCDF and the "safety, security and

care … on-going violations." Ex. 3 at -003. Similarly, while Mr. Houser claimed on March 7, 2022,

that TCDF had "substantially completed repairs" to correct the unsanitary conditions the Inspector

General had identified, Ex. 4 at 10, ICE's Contracting Officer reported *two days later* that the

"uncleanliness, disrepair, and preventative maintenance issues" remained "on-going violation[s],"

Ex. 3 at -004. Mr. Houser neither addressed the ICE Contracting Officer's damning report nor

provided supporting documentation sufficient to demonstrate that the poor facility conditions had

in fact been resolved. Ex. 4 at 11.

106.    In short, the Inspector General's unannounced inspection in February 2022 revealed

the ongoing unsafe, unhealthy, and dangerous conditions at TCDF, and ICE's own Contracting

Officer confirmed the accuracy of the Inspector General's findings in March 2022. ICE

leadership's attempted obfuscations could not hide the actual conditions both the Inspector General

and ICE's Contracting Officer identified.

## VI.    Less Than A Month After the Inspector General's And ICE Contracting Officer's Damning Findings, ICE Arbitrarily And Capriciously Certified That TCDF Passed the Follow-up Overall Performance Evaluation

107.    Despite the Inspector General's and the ICE Contracting Officer's unambiguous

March 2022 conclusions that TCDF was understaffed, unsafe, and unfit for habitation, Nakamoto

recommended that same month that TCDF pass its follow-up overall performance evaluation, and

ICE arbitrarily and capriciously adopted and certified that result on April 21, 2022.

### A.    Nakamoto Ignored The Evidence And Recommended That ICE Certify TCDF As Compliant With The PBNDS

108.    From March 29 to March 31, 2022—two weeks after the Inspector General's

Management Alert and only one week after ICE imposed contractual penalties for PBNDS

violations—Nakamoto conducted the inspection for ICE's follow-up overall performance

evaluation of TCDF.

109.    Nakamoto's March 2022 follow-up inspection departed from the Inspector General's February 2022 inspection in at least three meaningful ways.

110.    **First**, unlike the Inspector General's inspection, ICE both provided advance notice of Nakamoto's follow-up inspection (as it had decided to do in August 2021), and delayed the inspection, giving TCDF more time to prepare.

111.    **Second**, unlike the Inspector General's February 2022 inspection, Nakamoto's March 2022 follow-up inspection was a hybrid inspection. Under this format, one of the inspectors did not visit TCDF in person and thus could not personally observe TCDF's practices. ICE permitted Nakamoto to conduct a hybrid inspection despite the Inspector General's prior criticism of that practice for producing unreliable results. DHS OIG Inspections and Monitoring Report at 6, https://tinyurl.com/mrxs8np2.

112.    **Third**, Nakamoto neither mentioned nor considered contemporaneous reports of substandard conditions at TCDF, specifically the ICE Contracting Officer's report or the Inspector General's Management Alert.

113.    On March 31, 2022—merely two weeks after the Inspector General issued the Management Alert confirming that conditions at TCDF remained so "egregious" as to necessitate immediately removing all detained individuals from the facility, Ex. 4 at 3—Nakamoto issued a report, attached hereto as **Exhibit 5**, that asserted that TCDF was operating at "[o]ptimal levels" and recommended that it pass its follow-up overall performance evaluation. *See* Ex. 5 at 5.

114.    Nakamoto's report was conclusory and self-contradictory, and it failed to even acknowledge the contemporaneous evidence showing the actual critical understaffing, unsanitary and unhealthy conditions, and unsafe environment at TCDF.

115.    **Critical Understaffing**. Nakamoto's assertion that the "[t]he facility was appropriately staffed during the inspection," Ex. 5 at 5, ignored the obvious—that TCDF had relied on unsustainable, stop-gap staffing. That conclusion is evident from Nakamoto's own findings that

TCDF had temporarily assigned detention officers from other facilities and made its staff work overtime during the inspection period. *Id*. Indeed, Nakamoto itself appeared to conclude that this situation was unsustainable, noting that TCDF's "recruitment and retention efforts are unsatisfactory" because numerous vacancies had persisted since the failed overall performance evaluation in July 2021, and 12 of the 31 positions in the Medical Services Department were vacant. *Id*. This assessment is precisely what the Inspector General and ICE's Contracting Officer concluded: TCDF's efforts to correct understaffing had failed and TCDF remained chronically understaffed.

116.    ***Filthy, unhealthy, and unsanitary conditions***. While Nakamoto's report claimed that the facility was "clean" and that medical care was "[o]ptimal," Ex. 5 at 4–5, more detailed notes on its inspection worksheet told a different story. Nakamoto inspectors in fact made a "repeat finding" that TCDF fell well "below [] recognized safety and hygiene standards." The inspection worksheet revealed that the very medical and sanitation areas of the facility that Nakamoto's report claimed were "[o]ptimal," Ex. 5 at 5, in fact "did not meet minimal sanitation requirements" and were in an "unacceptable" state. Nakamoto's assertion that other areas of the facility were clean and sanitary similarly failed to engage with the Inspector General's and the ICE Contracting Officer's detailed findings to the contrary.

117.    ***Unsafe and insecure conditions***. Nakamoto's finding that TCDF met security standards blatantly and arbitrarily ignored the Inspector General's numerous findings about security deficiencies. As an initial matter, Nakamoto was aware of, and yet still relied on, the unsustainable, stop-gap staffing at TCDF to find that security positions were adequately staffed. Nakamoto made no attempt to square that finding with the Inspector General's and the ICE Contracting Officer's findings that same month that only 19% of such positions were *actually* filled and that, as a result, individuals detained by ICE were left unsupervised and at risk of harm. Further, Nakamoto's assessment that central control rooms and cameras provided adequate security ignored and completely failed to engage with the Inspector General's detailed criticism of

these same security measures. As the Inspector General documented and the photographs included in its report showed, the housing unit control rooms failed to provide proper security because of "Poor Sight Lines through Barred and Dirty Windows" and numerous "[b]lind spots," and the cameras and electronic door systems monitored by personnel assigned to the master control room were not an effective back-up monitoring system. Ex. 4 at 7.

**B. ICE Knew Or Should Have Known That Nakamoto's Findings Were Incorrect**

118.    Contemporaneous and subsequent audits, inspections, and documentation confirmed that Nakamoto's March 2022 follow-up inspection of TCDF was grossly deficient and inaccurate. ICE knew or should have known this when it adopted the recommendation in Nakamoto's inspection report and certified TCDF as compliant with the PBNDS on April 21, 2022.

119.    *First*, as described above, Nakamoto's March 2022 follow-up inspection report contradicted the Inspector General's Management Alert and the findings of ICE's Contracting Officer. ICE had abundant knowledge of this contemporaneous evidence. For instance, ICE personnel had accompanied the Inspector General's team during their February 1–3, 2022 on-site inspection, personally observed the same conditions those inspectors witnessed, and were briefed by those inspectors at the close of the inspection. Likewise, from February 2022 onwards, Director Acosta and the ICE El Paso Field Office staff communicated regularly with ICE headquarters in Washington concerning the Inspector General's inspection and Management Alert. Moreover, ICE leadership received and reviewed a draft of the Management Alert, and responded to the Inspector General in a March 7, 2022 letter from ICE's Acting Chief of Staff. And ICE of course knew the findings of its own Contracting Officer, which culminated in its decision to impose a contractual penalty for ongoing PBNDS violations at TCDF. Indeed, ICE notified CoreCivic of its decision to impose that penalty on April 15, 2022, only six days before it certified TCDF as compliant on April 21.

120.    *Second*, while Nakamoto asserted in March 2022 that TCDF met every single component of the sexual assault prevention PBNDS standard and that "procedures are being

32

followed," a Prison Rape Elimination Act ("PREA") compliance inspection conducted by a third-party auditor the very next month (April 19–21, 2022) resulted in audit findings that directly contradicted Nakamoto's March 2022 follow-up inspection report. The auditor informed ICE in an exit briefing on April 21, 2022—the same day that ICE certified Nakamoto's recommendation for the follow-up overall performance evaluation—that she could not yet provide TCDF with a definitive audit result. In her audit report, which issued the following month and is attached hereto as **Exhibit 6**, she found that TCDF failed to meet 11 of 39 applicable PREA standards, directly contradicting Nakamoto's report.

121.    Overall, the PREA auditor's report contradicted Nakamoto's claims that the facility was operating at "[o]ptimal … levels" in health and safety standards the previous month. Ex. 5 at 5. For instance, while Nakamoto asserted in the worksheet accompanying its report that "detainees … understood the zero-tolerance policy, and knew how to report sexual abuse," the PREA auditor's report found that in fact "three out of four detainees" did not, as they neither "complete[d] orientation [n]or received [] information" required by the Prison Rape Elimination Act. Ex. 6 at 7. Likewise, while Nakamoto claimed that TCDF had corrected its prior failure to coordinate with ICE for investigation of sexual abuse incidents, the PREA auditor's report found that TCDF had in fact "***neglected to report four allegations of sexual abuse***" to ICE or the Inspector General. *Id*. at 6 (emphasis added).

122.    Nakamoto's inexplicable failure to identify ***any*** of these numerous sexual abuse prevention deficiencies was further confirmation that its March 2022 follow-up inspection report could not be relied upon. This unreliability should have been evident to ICE by at least April 21, 2022, due to ICE's observations of the on-site April 19–21 PREA compliance inspection and the PREA auditor's April 21 exit briefing.

123.    ***Third***, ICE's comments on the Inspector General's draft report about violations of the PBNDS at TCDF demonstrate that ICE knew or should have known by April 21, 2022 that Nakamoto's March 2022 follow-up inspection report contained information that was simply

incorrect and that conditions in TCDF in fact remained substandard. On April 12, 2022, the Inspector General sent ICE a notice of its findings and recommendations arising from its February 2022 inspection. That notice identified additional violations of the PBNDS beyond those documented in the urgent Management Alert, including failures to provide timely medical care, to respond to detained individuals' requests, and to employ proper COVID-19 precautions. ICE provided comments on the Inspector General's draft report before it was finalized and published in September 2022. A copy of the Inspector General's final September 2022 report is attached hereto as **Exhibit 7**.

124.    ICE's comments revealed that, contrary to Nakamoto's assertion, at the time of the March 2022 follow-up inspection TCDF had not in fact remedied the unhealthy and unsanitary conditions the Management Alert had identified. Specifically, ICE stated, "[a]ll repairs to the conditions identified by the Inspector General were completed by *April 30, 2022*"—a month *after* Nakamoto had concluded the follow-up inspection and more than one week *after* ICE certified TCDF as complying with the PBNDS and determined it had passed its follow-up overall performance evaluation. Ex. 7 at 24 (emphasis added). ICE thus either knew or should have known by April 21, 2022 that the repairs were not yet completed.

125.    Similarly, with respect to other deficiencies identified by the Inspector General, ICE admitted in its comments on the Inspector General's draft report that many corrective measures did not start until May, July, or August 2022, and would not be completed until November 2022 (*id.* at 24–31)—further undermining Nakamoto's recommendation and ICE's certification that TCDF met standards at the time of the March 2022 follow-up inspection. ICE either knew or should have known as of April 21, 2022 that many of these corrective measures had not yet begun.

126.    Taken together, the following inspections, reports, and findings showed unequivocally that Nakamoto's March 2022 follow-up inspection report was unreliable and inaccurate:

- **February 1–3, 2022**: DHS's Inspector General conducted an unannounced, in-person inspection of TCDF, during which ICE personnel were present. The Inspector General

found egregious conditions at TCDF and shared them with ICE at a February 3, 2022 close-out briefing.

- **February 4, 2022**: ICE reported that the Inspector General had found very poor conditions, including unhealthy conditions and staff shortages.
- **March 1, 2022**: ICE's Contracting Officer reported that TCDF was in ongoing violation of its obligations under the PBNDS.
- **March 9, 2022**: ICE's Contracting Officer rejected TCDF's response to the March 1 report because it failed to address ICE's concerns and provided misleading information.
- **March 16, 2022**: The DHS Inspector General issued a "management alert" to ICE, calling for ICE to immediately remove from TCDF all individuals detained there.
- **April 19–21, 2022**: A third-party auditor conducted a three-day PREA inspection of TCDF, which TCDF failed.

ICE thus knew or should have known that Nakamoto's follow-up inspection report was unreliable and inaccurate when it adopted Nakamoto's recommendation and certified that the facility passed its March 2022 overall performance evaluation.

### C. ICE Ignored The Contrary Evidence And Adopted Nakamoto's Recommendation, Certifying That The Facility Passed Its Follow-up Overall Performance Evaluation

127.   Nakamoto's March 2022 follow-up inspection report and recommendation that TCDF be assigned an overall rating of "Meets Standards" stood alone amongst the overwhelming evidence to the contrary—including the Inspector General's February 2022 inspection and the ICE Contracting Officer's report that *preceded* the Nakamoto inspection, and the April 2022 PREA audit that *followed* it. In other words, the contemporaneous evidence surrounding Nakamoto's March 2022 follow-up inspection report plainly undermined its findings.

128.   Because ICE knew of both Nakamoto's defective methodologies and the inadequate conditions at TCDF that the Inspector General, a third-party PREA auditor, ICE's own Contracting Officer, and other ICE personnel had repeatedly documented, ICE should have critically evaluated the Nakamoto March 2022 follow-up inspection report against the contemporaneous evidence demonstrating that TCDF did not meet standards. At a minimum, ICE should have explained how, notwithstanding that evidence, awarding TCDF a "Meets Standards" on its critical follow-up overall performance evaluation could somehow be reasonable.

129.   Instead, ICE knowingly rubber-stamped Nakamoto's March 2022 recommendation

without any meaningful review or reasoned analysis of Nakamoto's report or contradictory contemporaneous evidence. On April 21, 2022, Defendant Burke issued a memorandum, attached hereto as **Exhibit 8**, that adopted Nakamoto's recommendation and assigned TCDF "[a] final rating of Meets Standard." Ex. 8.

130.    Defendant Burke's memorandum confirmed what ICE's response to the Inspector General's findings had already made obvious: ICE shirked its responsibility over the inspection process and ignored evidence of glaringly deficient conditions to achieve its preconceived conclusion that TCDF should pass the follow-up overall performance evaluation to avoid the consequences of the Two Strikes Mandate set by Congress.

131.    Indeed, Defendant Burke's memorandum made no attempt to address the three principal and obvious gaps in Nakamoto's March 2022 follow-up inspection report: (1) its self-contradictory assertions, (2) its clear inconsistencies with contemporaneous independent reports and audits, and (3) its conflicts with other information known to ICE.

132.    *First*, the memorandum never addressed the contradictions within Nakamoto's March 2022 follow-up inspection report. In that report, Nakamoto made findings that the facility failed cleanliness standards yet again; that the medical and sanitation areas of the facility were grossly unsanitary; and that efforts to correct chronic understaffing had failed, leaving numerous vacancies in medical and security positions. Despite those findings, Nakamoto concluded in the report that TCDF was clean, providing optimal medical care, and properly staffed.

133.    *Second*, the memorandum did not address any of the Nakamoto report's clear inconsistencies with the chorus of contemporaneous reports documenting atrocious conditions at TCDF, including the Inspector General's February 2022 inspection and March 2022 Management Alert, ICE's own March 2022 Contract Discrepancy Report, and the April 2022 PREA compliance inspection.

134.    *Third*, the memorandum also failed to address the contradictions between information known to ICE and Nakamoto's claim that deficiencies had already been corrected.

ICE knew that TCDF's attempts to correct the many deficiencies identified by the Inspector General were either not complete or had not even begun at the time of the follow-up overall performance inspection and ICE's April 21, 2022 certification. Yet ICE certified TCDF as meeting standards in its make-or-break follow-up overall performance evaluation by arbitrarily relying on *plans* for future improvements instead of measuring whether TCDF had *in fact* complied with the PBNDS as of the date of the certification. Indeed, ICE's decision to certify TCDF as meeting standards despite these uncorrected issues was contrary to Director Acosta's October 2021 statement to ICE staff that deficiencies at TCDF needed to be "corrected 'on the spot'" before the inspection for the follow-up overall performance evaluation, in order for TCDF to obtain a passing rating.

135.    ICE's decision to assign TCDF a passing rating despite documented flagrant deficiencies achieved the intended and preconceived result that ICE had pursued since the summer of 2021: evading the Two Strikes Mandate and thus allowing ICE to continue detaining noncitizens at TCDF.

**VII.    ICE's Increased Reliance On TCDF Directly Harms Detained Individuals**

136.    Because ICE arbitrarily and capriciously certified TCDF as meeting standards in April 2022, ICE did not discontinue the detention of noncitizens at TCDF, as the Two Strikes Mandate required.

137.    As a result, noncitizens continue to be detained there and suffer grossly inadequate conditions.

138.    Instead of following the Inspector General's virtually contemporaneous recommendation to immediately relocate all detained individuals, ICE defied it and admitted additional detained individuals to TCDF. In April 2022 alone, ICE transferred more than one hundred noncitizens into TCDF. Austin Fisher, *ICE brings more people into Torrance detention center, congresswoman's staff confirms*, Source NM (Apr. 22, 2022), https://tinyurl.com/d4236hn6. This transfer in the wake of the Inspector General's Management

Alert drew attention and criticism from lawmakers and advocates alike, and for good reason—the reality at TCDF remains dire, and no amount of obfuscation or cosmetic fixes can conceal it.

139.    For example, uncorrected deficiencies in TCDF's compliance with PREA standards exposed detained individuals to the risk of sexual harm and lack of redress. After receiving the PREA auditor's report following the April 19–21, 2022 PREA compliance inspection, TCDF had 180 days to develop and implement a plan to correct the 11 deficiencies identified in the report. The PREA auditor found in December 2022 that TCDF had failed to undertake adequate corrective action and that 6 of the 11 deficiencies remained unresolved. *See* Ex. 6 at 2. Certain of these uncorrected deficiencies—TCDF's failure to report sexual abuse complaints to ICE and to inform detained individuals about sexual assault prevention policies and resources—were the very same deficiencies that Nakamoto's March 2022 follow-up inspection report wrongly claimed that TCDF had already corrected.

140.    Likewise, in May 2022, ICE's ODO reported that TCDF still was not reviewing detained individuals' medical records properly to determine the priority for treatment, a repeat deficiency that ODO had previously identified in November 2021. That same month, DHS's Office for Civil Rights and Civil Liberties ("CRCL") confirmed that there were ongoing "critical concerns" at TCDF beyond those described by the Inspector General's March 2022 Management Alert. For instance, CRCL found that staffing shortages persisted and that "five (5) officer posts [were] unfilled on each shift every day," which CRCL characterized as "significantly low for the population managed." CRCL also found that there were "broken porcelain sinks" throughout one of the housing units. This damage was not only a cleanliness issue, but also a safety issue, because the shards could cause injury or be used as a weapon. CRCL noted that TCDF's use of porcelain toilets was dangerous for the same reason. Then, in September 2022, CRCL issued a report based on an on-site investigation it conducted at TCDF in June 2022, with the assistance of four subject-matter experts; this report included additional findings including—once again—further security lapses, broken fixtures, inadequate food service procedures, deficiencies in medical and mental

health care, and staffing shortages. These and additional severely deficient conditions have prompted detained individuals at TCDF to launch multiple hunger strikes, including in September 2022 and January 2023.

141.    Detained individuals' complaints have further confirmed that TCDF continued the unclean, unhealthy, and unsafe conditions that the Inspector General and ICE's Contracting Officer identified. In September 2022, twelve individuals detained at TCDF issued an open letter and announced a hunger strike to protest dangerous conditions. They stated that TCDF was "filthy," "the bathrooms [were] covered in mold," and there was insufficient drinking water. Navarro Laverde, Miguel *et al*, *Open Letter from "Lost Ultimos Guerreros," the Last People Detained by ICE at Torrance County Detention Facility*, Innovation Law Lab (Dec. 8, 2022), https://tinyurl.com/yj63zddn. These complaints were consistent with the findings from the July 2021 inspection report leading TCDF to fail its overall performance evaluation, the Inspector General's March 2022 Management Alert, and the ICE Contracting Officer's contemporaneous documentation of substandard conditions. Another detained individual issued a statement that people held in ICE custody at TCDF "don't have basic necessities like water, food, safety, sanitary facilities, [and] adequate medical attention." *Immigrants Detained at Torrance County Detention Facility In New Mexico Announce Hunger Strike, Issue Collective Protest Letter*, ACLU NM (Sept. 28, 2022), https://tinyurl.com/5cyw7n4f. In May 2023, a detained individual was seriously injured when he slipped and fell due to a water leak that he and others had earlier reported to staff—the precise type of slip-and-fall the Inspector General's March 2022 Management Alert had warned of. *See* Ex. 3 at 5.

142.    ICE's failure to ensure that TCDF maintains even a minimally safe and healthy environment has had grave consequences. On August 24, 2022, Kesley Vial, a 23-year-old Brazilian asylum seeker, was pronounced deceased from a fatal suicide attempt that had occurred while he was detained at TCDF the week before. Mr. Vial was originally transferred into TCDF in late April 2022, about a week after Defendant Burke arbitrarily and capriciously certified that

TCDF had passed its follow-up overall performance evaluation. ICE's own investigation identified systemic violations of the relevant standards of care at TCDF that contributed to Mr. Vial's death and highlighted security failures that the Inspector General had previously identified—the limited views from TCDF housing unit control rooms and the inadequate controls on housing unit doors. The investigation observed that security personnel in the control room had only a "limited" view of the cells in the housing unit in which Mr. Vial was detained, and that although video footage showed "movement" in the cell just before the fatal suicide attempt, TCDF personnel did not identify the suicide attempt or provide an emergency response until at least 18 minutes after that "movement" was visible. The investigation also observed that TCDF personnel permitted Mr. Vial to take a bedsheet into a cell to which he was not assigned, just prior to the fatal suicide attempt, and that "procedures are neither known nor enforced" for the monitoring or approval of cell changes by detained individuals. Similarly, the investigation found multiple deficiencies in areas that had previously been identified by Nakamoto's July 2021 inspection report, the Inspector General, and ICE's own Contracting Officer, including failures to properly track prescribed medications and the deficient training of personnel. Since Mr. Vial's death, additional suicide attempts at TCDF have been reported, suggesting that the grossly inadequate detention conditions linked to Mr. Vial's death remain uncorrected.

143.    Plaintiffs' experiences confirm that dangerous and unhygienic conditions persist at TCDF. Plaintiffs have received grossly inadequate medical care while detained at TCDF, including being placed in prolonged medical isolation and being subjected to severe delays in treatment. They do not have enough drinking water because the tap water at TCDF is not safe to drink, the water fountains are moldy, and the guards provide too little potable water. They are given insufficient quantities of food, which is often inedible. Although TCDF is very cold, they are provided with inadequate bedsheets and clothing. The sanitation at TCDF also remains abysmal: toilets and sinks are clogged, and only a limited number of showers are functional.

144.    Enough is enough. ICE has known since at least the summer of 2021 that TCDF is

critically understaffed and unsafe. By April 21, 2022, when ICE certified that TCDF had passed its follow-up overall performance evaluation, ICE either knew or should have known that conditions in the facility remained dire. As ICE's own Contracting Officer concluded the previous month, TCDF "has not been able to demonstrate the ability to provide a safe environment," a conclusion that ICE reaffirmed on April 15, 2022—only six days before certifying TCDF—by notifying TCDF's operator that it would be imposing a 15% deduction penalty. By rubber-stamping Nakamoto's March 2022 recommendation that TCDF meets federal detention standards, despite the clear and abundant evidence to the contrary, ICE has condemned Plaintiffs and other noncitizens to suffer in unlawful and inhumane conditions. Congress expressly sought to avoid such a grave failure of oversight by requiring ICE to comply with the Two Strikes Mandate. The time to enforce that Congressional mandate is now. ICE's unjustifiable and arbitrary decision to certify TCDF as passing its critical follow-up overall performance evaluation must be vacated. And if ICE fails to reverse or provide an adequate explanation for its April 2022 certification decision on remand, the Court should declare that TCDF failed the follow-up overall performance evaluation, declare that ICE violated the Two Strikes Mandate, and enjoin ICE from continuing to detain noncitizens at TCDF, as the Two Strikes Mandate requires.

## CLASS ACTION ALLEGATIONS

145.    Plaintiffs bring this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of all persons who are currently or will be detained by ICE at TCDF (collectively, the "Class").

146.    Pursuant to Rule 23(a)(1), the members of the Class are so numerous that joinder of all members is impracticable. As of September 2023, ICE statistics reported that there were 212 individuals detained at TCDF. *See Lowery v. City of Albuquerque*, 273 F.R.D. 668, 682 (D.N.M. 2011) (concluding that "several hundred class members" are "so numerous that joinder would be impracticable," and that therefore the Rule 23(a)(1) numerosity requirement is satisfied); *see also Rex v. Owens*, 585 F.2d 432, 436 (10th Cir. 1978) (collecting cases in which classes with less than

40 members were found to satisfy the numerosity requirement).

147.    In addition, joinder is especially impracticable because the Class changes regularly as additional noncitizens are transferred into, and others are transferred out of, TCDF. Because TCDF is currently being used primarily to detain noncitizens in expedited removal proceedings, releases, transfers, and deportations are typically occurring within a rapid timeframe of a matter of weeks.

148.    Pursuant to Rule 23(a)(2), there are questions of law or fact common to the Class, including:

   a) Whether TCDF should have failed, and in fact constructively did fail, its 2022 follow-up overall performance evaluation because conditions at TCDF violated the PBNDS in fundamental ways;

   b) Whether ICE's certification of TCDF on April 21, 2022 as compliant with the PBNDS and the resulting decision to continue detaining noncitizens at TCDF was arbitrary and capricious and contrary to law; and

   c) Whether ICE's reliance on Nakamoto to conduct the March 2022 follow-up inspection, despite Nakamoto's extensive record of incompetence and unreliability, was arbitrary and capricious and contrary to law.

149.    Pursuant to Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and the Class have suffered harm, principally continued detention at TCDF, as a result of Defendants' actions in conducting a faulty inspection and certification of compliance with the PBNDS at TCDF in order to evade Congress' Two Strikes Mandate.

150.    Pursuant to Rule 23(a)(4), Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel from the National Immigrant Justice Center, the American Civil Liberties Union of New Mexico, Innovation Law Lab, and Quinn Emanuel Urquhart & Sullivan, LLP, who are experienced in federal and class action litigation. Plaintiffs have no interests that conflict with those of the Class.

151.    Pursuant to Rule 23(b)(2), Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT 1
**Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)**
**ICE's Certification of TCDF as Compliant with the PBNDS**

152.    Plaintiffs reallege and incorporate the allegations of all the preceding paragraphs.

153.    ICE is a component of DHS and constitutes an "agency" under the APA. 5 U.S.C. § 551(1).

154.    The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA also requires agency actions be set aside when they are "short of statutory right" or "without observance of procedure required by law." *Id.* § 706(2)(C), (D).

155.    ICE's certification of TCDF as compliant with the PBNDS on April 21, 2022 constitutes a final agency action that is reviewable under 5 U.S.C. § 704.

156.    Since 2009, including in the Consolidated Appropriations Act of 2023, Congress has prohibited ICE from "continu[ing] any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than 'adequate' or the equivalent median score in any subsequent performance evaluation system." Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, Div. F, Tit. II, § 214(a), 136 Stat. 4459, 4736 (Dec. 29, 2022).

157.    Conditions at TCDF have violated the PBNDS in numerous ways. Nakamoto's July 2021 inspection identified 22 deficient components—5 of which were of "Priority"—across 8 different standards. Nakamoto found that TCDF failed the Food Service standard altogether, which

constituted 12 deficient components.

158.    In August 2021, Defendants Burke and Wong certified that TCDF failed the 2021 overall performance evaluation, and ICE recognized that a consecutive failure would require termination of the contract.

159.    In March 2022, Nakamoto conducted the inspection for the follow-up overall performance evaluation by performing a hybrid inspection in which one inspector was fully remote. Despite finding that TCDF remained understaffed and again failed cleanliness and sanitation standards, Nakamoto purported to find that TCDF was operating at "[o]ptimal levels" and recommended that TCDF pass the overall performance evaluation. *See supra* Section VI.

160.    Nakamoto's March 2022 follow-up inspection report was contradicted by numerous contemporaneous independent reports, assessments, and other sources of information known to ICE. In February and March 2022, an unannounced in-person inspection by DHS's Inspector General and a report by ICE's own Contracting Officer independently confirmed that TCDF was an unsafe, unhealthy, and dangerous environment wholly unfit for continued use. On April 19–21, 2022, another third-party audit identified numerous sexual assault prevention deficiencies. Further, ICE's own comments on the Inspector General's findings and recommendations show that ICE knew in April 2022 that TCDF either had not begun to correct or had not completed correcting the grave deficiencies the Inspector General had identified.

161.    Despite ICE's awareness of persistent substandard conditions in the facility, on April 21, 2022, Defendant Burke concluded that TCDF passed its follow-up overall performance evaluation.

162.    This final agency action resulting in the continuation of the detention contract— ICE's certification that TCDF "Meets Standards"—was contrary to law because conditions at TCDF were grossly inadequate under the PBNDS such that it should have been rated "Does Not Meet Standards" for the second consecutive time, requiring termination of the contract under the Two Strikes Mandate.

163.    This final agency action was also "arbitrary, capricious, [and] an abuse of discretion," 5 U.S.C. § 706(2)(A), because ICE did not "articulate a satisfactory explanation for its action" that reflects a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citations and quotations omitted). "Normally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Id.* ICE failed in both respects here, and therefore, acted arbitrarily and capriciously.

164.    ICE acted arbitrarily and capriciously because it failed to consider the flawed inspection and reasoning process that Nakamoto employed. *See supra* Section VI.

165.    ICE also acted arbitrarily and capriciously because it failed to offer a reasonable explanation for its decision to certify TCDF as "Meets Standards" in light of contrary evidence known to ICE at the time of its certification, including but not limited to the findings by the Inspector General, ICE's Contracting Officer, and ICE's third-party sexual assault prevention auditor. ICE further failed to explain why it accepted Nakamoto's claim that TCDF had corrected prior deficiencies when ICE itself knew that TCDF had either not begun to make or not completed those corrections. *See supra* Section VI. This type of unexplained decision-making in light of apparent inconsistency is a hallmark of arbitrary and capricious decision making. *See, e.g., Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220–22 (2016) (an "unexplained inconsistency" or failure to explain a change can reflect arbitrary and capricious decision-making).

166.    Therefore, for the reasons stated above, ICE's certification that TCDF "Meets Standards" of the PBNDS on April 21, 2022, and the resulting continuation of the detention contract violated the APA because it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(A). For the same reasons, ICE's decision was also "short of statutory right" or "without observance of procedure required by law." *Id.* § 706(2)(C), (D).

167.    ICE has continued to use TCDF to detain individuals like Plaintiffs, in violation of the Two Strikes Mandate. Widespread violations have persisted to the present day, as Plaintiffs have personally experienced. As such, Class members continue to suffer from Defendants' violation of the APA, and the declaratory and injunctive relief sought is necessary to prevent continued and future irreparable harm to themselves and others similarly situated.

## PRAYER FOR RELIEF

Plaintiffs request that the Court:

A.    Assume jurisdiction over this matter;

B.    Issue an order certifying this action to proceed as a class action pursuant to Federal Rule of Civil Procedure 23;

C.    Appoint the undersigned as class counsel pursuant to Rule 23(g);

D.    Declare that ICE's April 2022 certification that TCDF "Meets Standards" of the PBNDS based on the follow-up overall performance evaluation violated the APA;

E.    Vacate ICE's April 2022 certification that TCDF "Meets Standards" of the PBNDS based on the follow-up overall performance evaluation, and remand to the agency to reverse the certification decision or to provide a fuller explanation of the agency's action at the time of the follow-up overall performance evaluation;

F.    Retain jurisdiction over this action pending a reversal or reasonable explanation of the agency's April 2022 certification of TCDF at the time of the follow-up overall performance evaluation;

G.    In the event that ICE fails to reverse or provide a valid explanation of the agency's April 2022 certification of TCDF based on the follow-up overall performance evaluation:

i.    Declare that Defendants' certification of TCDF as "Meets Standards" under the PBNDS in April 2022 was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law in violation of the APA;

ii.    Declare that TCDF failed the follow-up overall performance evaluation because it was not in compliance with the PBNDS;

iii.    Enjoin ICE from using federal funds to continue the contract for detention at TCDF; and

iv.    Enjoin ICE from continuing to detain Class members at TCDF.

Dated:  October 17, 2024                    Respectfully submitted,

                                           By:   /s/ Rebecca Sheff
                                                _____

Mark Feldman                               Deepa Acharya*
Mark Fleming                               QUINN EMANUEL URQUHART & SULLIVAN, LLP
Mary Georgevich                            1300 I St. NW, Suite 900
NATIONAL IMMIGRANT JUSTICE CENTER          Washington, DC 20005
111 W. Jackson, Suite 800                  202-538-8000
Chicago, IL 60604                          deepaacharya@quinnemanuel.com
312-660-1370
mfeldman@immigrantjustice.org              Linda Moon*
mfleming@immigrantjustice.org              Sasha Boutilier*
mgeorgevich@immigrantjustice.org           QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                           51 Madison Avenue, 22nd Floor
Tess Hellgren                              New York, NY 10010
Alison Coutifaris                          212-849-7000
Rachel Landry                              lindamoon@quinnemanuel.com
INNOVATION LAW LAB                         sashaboutilier@quinnemanuel.com
333 SW 5th Ave., Suite 200
Portland, OR 97204                         Seth Montgomery
503-922-3042                               QUINN EMANUEL URQUHART & SULLIVAN, LLP
tess@innovationlawlab.org                  865 S. Figueroa St., 10th Floor
alison.c@innovationlawlab.org              Los Angeles, CA 90017
                                           213-443-3000
Rebecca Sheff                              sethmontgomery@quinnemanuel.com
Max Isak Brooks
ACLU OF NEW MEXICO
P.O. BOX 566
Albuquerque, NM 87103
(505) 266-5915
rsheff@aclu-nm.org
mbrooks@aclu-nm.org                        *Counsel for Plaintiffs*

*  Admitted pro hac vice*