IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CARLOS DOE, LUIS DOE, and
GABRIEL DOE,

      Plaintiffs,

v.                                           Case No. 1:23-cv-00971-MLG-JMR

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

      Defendants.

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' OPPOSED
MOTION TO COMPLETE AND SUPPLEMENT THE ADMINISTRATIVE RECORD**

**FACTUAL BACKGROUND**

Plaintiffs are three non-citizen asylum seekers who were held in custody at the Torrance County Detention Center ("Torrance") by United States Immigration and Customs Enforcement ("ICE"). *See* Doc. 84 at 5 ¶ 14-6 ¶ 17. Plaintiffs sued ICE, the Department of Homeland Security ("DHS"), and five individual ICE officials under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, for ICE's alleged violation of federal detention and contracting standards. *Id.* at 45 ¶ 152-48 ¶ 167.

Torrance is operated by CoreCivic, a private prison company. *Id.* at 14 ¶ 54. Because Torrance accepts ICE detainees, it must comply with ICE's 2011 Performance-Based National Detention Standards ("National Detention Standards") to receive federal funding. *See id.* at 8 ¶¶ 26-27. Plaintiffs allege that Torrance does not meet these benchmarks and houses ICE detainees in unsafe, unclean, and inhumane conditions. *Id.* at 39 ¶ 136-43 ¶ 144. There is reason to credit those contentions. Torrance failed an annual compliance review conducted by another ICE contractor,

1

the Nakamoto Group ("Nakamoto"), in the summer of 2021. *Id.* at 14 ¶ 55; Doc. 81-3 at 19-23 (July 29, 2021, inspection report).

After Torrance was deemed substandard, Nakamoto conducted a hybrid[1] follow-up review of the facility between March 29 and 31, 2022.[2] Doc. 81-2 at 590-595 (March 31, 2022, inspection report). In stark contrast with its prior inspection, Nakamoto concluded Torrance met the relevant National Detention Standards. Doc. 81-2 at 594. ICE, through Defendant Monica S. Burke,[3] adopted that conclusion and certified Torrance as compliant on April 21, 2022. Doc. 84 at 31 ¶ 107; Doc. 81-2 at 892 (Burke's certification memorandum).

Despite Nakamoto's findings, several other federal entities concluded that Torrance had significant ongoing issues, which Plaintiffs assert should have resulted in a finding of noncompliance. For example, between February 1 and 3, 2022, inspectors from the DHS Office of Inspector General conducted an unannounced inspection ("OIG Inspection") of Torrance and found poor conditions for detainees. Doc. 84 at 24 ¶ 90. The Inspector General subsequently issued a "Management Alert" on March 16, 2022, which recommended an immediate relocation of ICE detainees from Torrance due to "critical staffing shortages[.]" Doc. 4-4 at 3-4. On March 9, 2022, an ICE Contracting Officer tasked with overseeing Torrance's compliance with its detention contract reported that the facility was in violation of the National Detention Standards. Doc. 84 at

---

[1] The hybrid review used four on-site inspectors, while one off-site inspector conducted remote staff interviews and file review. Doc. 81-2 at 593.

[2] A subsequent failure to meet federal benchmarks would have significant consequences; ICE would be legally required to cut ties with the facility. Doc. 84 at 9 ¶ 35-10 ¶ 36 (citing Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Pub. L. No. 110-329, Div. D, Tit. II, 122 Stat. 3574, 3658-59 (Sept. 30, 2008)).

[3] As ICE's Acting Assistant Director of Custody Management, Burke was responsible for ensuring detention facilities' compliance with the National Detention Standards. Doc. 84 at 7 ¶ 23.

24 ¶ 91. ICE determined that the violations were significant enough to withhold fifteen percent of its monthly contractual payments to Torrance. *Id.* at 25 ¶ 95. After Nakamoto's follow-up review, an April 2022 Prison Rape Elimination Act ("PREA") audit found that Torrance failed to meet eleven applicable PREA standards. Doc. 4-6 at 2-3. DHS's Office for Civil Rights and Civil Liberties ("CRCL") also inspected Torrance on April 19 and between June 27 and 30, 2022, and found continuing safety, security, and hygiene deficiencies. Doc. 84 at 38-39 ¶ 140; Doc. 73-12 at 2-3.

## PROCEDURAL HISTORY

As required for APA review, the Government filed the administrative record documenting ICE's decision-making process. *See* Docs. 81; 81-1; 81-2; 81-3. Absent from the record are documents related to the OIG Inspection, Contracting Officer's decision to withhold funds, PREA audit, and CRCL inspection findings. Doc. 73 at 2-4. Plaintiffs filed their Motion to Complete and Supplement the Administrative Record ("Motion") and ask the Court to add the subject documents to the record, either to complete the record or supplement it with extra-record material. *See generally id.* Plaintiffs contend that four categories of evidence are necessary additions to the current record: the Inspector General's findings ("OIG Materials"), ICE's withholding of contract payments to Torrance ("Contract Discrepancy Materials"), the PREA audit findings ("PREA Audit"), and CRCL's documentation on its inspection findings ("CRCL Materials"). *See id.* at 3-4; Doc. 73-1. Having reviewed the parties' briefing, heard oral argument, and considered the applicable law, the Court concludes that Plaintiffs fail to provide sufficient evidence showing that the record is incomplete or requires supplementation. Accordingly, the Court denies the Motion.

## DISCUSSION

Judicial review of administrative actions "is generally based on the full administrative record that was before all decision makers . . . at the time of the decision." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993). "The complete administrative record consists of all documents and materials directly or indirectly considered by the agency." *Id.* The agency designates the record, and there is a strong presumption that the compiled record is proper absent clear evidence to the contrary. *Comm. of 100 on the Fed. City v. Foxx*, 140 F. Supp. 3d 54, 59 (D.D.C. 2015). A party may add materials to an existing administrative record by showing it is incomplete or that extra-judicial evidence not before the agency should be considered by the Court. *Univ. of Colo. Health v. Azar*, 486 F. Supp. 3d 185, 199-200 (D.D.C. 2020). In either case, it is incumbent on the movant to produce clear and substantial evidence supporting its arguments. *See id.* at 200.

**I.    Record Completion**

Plaintiffs argue that the administrative record is incomplete because it does not contain the OIG Materials and the Contract Discrepancy Materials, which Defendants purportedly considered during their decision-making process. Doc. 73 at 12-18. To substantiate this claim, Plaintiffs must demonstrate the agency excluded materials, intentionally or otherwise, that were part of the record. *Azar*, 486 F. Supp. 3d at 200. Concrete evidence that the documents were put before the decisionmakers is required, and it must support reasonable, non-speculative bases to justify Plaintiffs' claims that the materials were considered by the agency as part of its decision-making process. *Univ. of Colo. Health at Mem. Hospital v. Burwell*, 151 F. Supp. 3d 1, 13 (D.D.C. 2015). Finally, Plaintiffs should identify the omitted records with specificity; broad categories of documents and data are not sufficiently specific to justify completion. *See id.*

ICE manages its review of detention facilities through its Detention Management Control Program ("DMCP"). Doc. 81-2 at 456-505. The DMCP "prescribes facility inspections procedures implemented by [DHS], [ICE], [and the] Office of Enforcement and Removal Operations (ERO) to ensure that [detention facilities] operate in a safe, secure, and humane manner that protects detainees, staff, visitors, volunteers, and contractors." *Id.* at 460. The DMCP identifies the Assistant Director for Custody Management as the "Review Authority" for ICE's facility inspection program and designates them with responsibility "for the sound fiscal and physical monitoring of ICE detention facilities housing single adults."[4] *Id.* To that end, the Review Authority must annually certify that detention facilities are "[m]eeting or exceeding the requirements of the applicable ICE detention standards (e.g., NDS 2000 or 2019, or [the National Detention Standards])." *Id.* at 464-65. Additionally, the DMCP requires the Deputy Assistant Director/Oversight, Compliance, and Acquisition Division ("DAD-OCAD") to provide direct oversight of the day-to-day inspection process and brief the Review Authority on significant findings. *Id.* at 465. Consequently, both the Review Authority and the DAD-OCAD's knowledge of inspection materials is highly relevant. *See Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) ("[I]f the agency decisionmaker based [her] decision on the work and recommendations of subordinates, those materials should be included as well.").

Here, Acting Assistant Director Burke was the Review Authority who decided Torrance met applicable National Detention Standards after Nakamoto's follow-up inspection. Doc. 81-2 at 892. Defendant Ricardo A. Wong officially filled the DAD-OCAD role, although an unnamed ICE Unit Chief filled in as an acting DAD-OCAD to evaluate Nakamoto's inspection of Torrance. *See*

---

[4] As this discussion suggests, the DMCP vests decision-making authority for detention facilities' National Detention Standards compliance in the Assistant Director for Custody Management.

5

Doc. 73-3 at 3 ("In this case, the quality control review was performed by a Unit Chief who was serving as [the DAD-OCAD] at the time."); Doc 81-2 at 893 (routing form for Torrance approval memorandum signed by Unit Chief).[5] Accordingly, the relevant inquiry is whether Plaintiffs have produced "concrete" evidence showing Burke or the DAD-OCAD considered or were affirmatively aware of the OIG Materials and the Contract Discrepancy Materials during the decision-making process.[6] *Azar*, 486 F. Supp. 3d at 200.

Turning first to the OIG Materials, Plaintiffs identify two email exchanges dated February 4, 2022, related to the Inspector General's spot inspection of Torrance's facility. Doc. 73-1 (requesting admission of Docs. 73-6 and 73-7, the subject email chains). Burke and the DAD-OCAD are not named in any of these communications, and there is no indication that the communications were presented to either individual or their subordinates during the review process. *See generally* Docs. 73-6; 73-7. Moreover, Plaintiffs make no argument and provide no

---

[5] Francisco Madrigal, who was the DAD-OCAD as of August 16, 2024, also submitted an affidavit detailing the general principles governing review of ICE detention facilities and the specific circumstances surrounding Nakamoto's March 2022 follow-up review of Torrance. *See generally* Doc. 77-1 at 1-7. While this affidavit provides useful background, Madrigal does not state he was in the DAD-OCAD role during the relevant time period. He also fails to establish that he had personal knowledge of the particular review process at issue. His factual statements are therefore of little use here.

[6] The parties dispute whether the DMCP or the Statement of Work ("SOW") for ICE's inspection contractors controls the review process for a facility's National Detention Standards compliance. *Compare* Doc. 77 at 5 ("To the extent there is tension between the two documents regarding inspections, the SOW controls."), *with* Doc. 80 at 3 ("The DMCP is governing policy."). For purposes of record completion, the DMCP is the more relevant document because it clearly sets out Burke's responsibilities as the Review Authority and those of her subordinates. *See* Doc. 81-2 at 464-467. Moreover, Burke specifically cited the DMCP in her approval memorandum, indicating that she was acting in accordance with its policies and procedures. *Id.* at 892. In contrast, the SOW establishes inspection contractors' (here, Nakamoto) obligations in carrying out facility inspections and reporting findings to ICE. *See id.* at 506-40.

explanation as to how these emails would have made their way to either decisionmaker. Consequently, there is no legal basis supporting their inclusion in the record.

Next, Plaintiffs seek to add the March 16, 2022, Management Alert issued by the Inspector General, Doc. 4-4, and the related Notice of Findings and Recommendations dated April 12, 2022, Doc. 73-4. Doc. 73-1 at 2. Again, Plaintiffs provide no evidence establishing that Burke reviewed or considered these materials or that the DAD-OCAD would have known about them. The Management Alert and related Notice do not name Burke or any other relevant individual in the transmission materials. *See* Doc. 4-4 at 3 (Management Alert transmission memorandum); Doc. 73-3 (notice of OIG Inspection findings, including transmission emails). Plaintiffs point to an April 13, 2022, email where an ICE official in a different agency component mentioned the OIG Inspection in passing, but none of the immediate decisionmakers are included in that email chain. *See* Doc. 73 at 16; Doc. 73-8 at 4-5 (relevant email). In fact, the only evidence Burke knew about the OIG Inspection is a July 2022 memorandum she authored which briefly mentions the OIG Inspection in its background section. *See* Doc. 73-9 at 2. Nothing in the memorandum shows that she considered the OIG Inspection or any of the OIG Materials in her role as Review Authority under the DMCP. For these reasons, Plaintiffs have not shown that the record should be completed with the OIG Materials. *See WildEarth Guardians v. Salazar*, 670 F. Supp. 2d 1, 6 (D.D.C. 2009) (finding that "a singular reference" to a document "in the background section" of a related filing was insufficient to support addition of the document under the completion doctrine).

Plaintiffs' arguments regarding the Contract Discrepancy Materials suffer from similar deficiencies. Plaintiffs ask to include a staffing alert from ICE to CoreCivic regarding Torrance, the ICE Contracting Officer's contract discrepancy and modification report and related communications, and emails regarding National Detention Standards violations at Torrance. *See*

7

Doc. 73-1 at 2. Again, Plaintiffs make no showing that Burke or the DAD-OCAD knew of or considered these materials during the DMCP review process. The staffing alert is absent of any reference to the Assistant Director for Custody Management (Burke's position) or the DAD-OCAD. *See generally* Doc. 73-5. The Contracting Officer's discrepancy report, modification form, and related correspondence between ICE contracting officers and Torrance's warden also lack any mention of the relevant decisionmakers. *See generally* Doc. 4-3. The emails regarding National Detention Standards violations are between members of ICE's Office of Acquisition Management and a member of ICE's Office of the Principle Legal Advisor. *See generally* Doc. 73-8. Burke and the DAD-OCAD appear in none of the email chains. *See id.* Moreover, the DMCP does not include the Office of Acquisition Management or the Office of the Principle Legal Advisor as reviewing entities involved in certifying detention facilities' compliance with the National Detention Standards. *See* Doc. 81-2 at 464-67 (DMCP section setting internal review responsibilities). And while the emails state that ICE ERO was broadly aware of issues at Torrance, there is nothing connecting ERO's awareness with Burke or the DAD-OCAD. *See generally* Doc. 73-8.

Simply put, Plaintiffs have not provided evidence sufficient to overcome the strong presumption of completeness afforded to the administrative record in this case. *Comm. of 100 on the Fed. City*, 140 F. Supp. 3d at 59. They have not clearly shown that Burke or the DAD-OCAD were substantively aware of or considered the subject materials in carrying out their responsibilities under the DMCP. To the extent the evidence shows that ICE ERO and other agency components were aware of the OIG Inspection and Contract Discrepancy Materials, there is no indication that those materials were reviewed by Burke or any other relevant individual under the DMCP. *See WildEarth Guardians v. U.S. Forest Serv.*, 713 F. Supp. 2d 1243, 1256 (D. Colo. 2010) ("The proper touchstone remains the decision makers' actual consideration, and a party . . . must

show with clear evidence the context in which materials were considered by decision makers in the relevant decision making process."). Accordingly, the Court denies Plaintiffs' request to complete the record with the OIG Materials and the Contract Discrepancy Materials.

## II.   Record Supplementation

Plaintiffs alternatively request that the Court supplement the administrative record with all their requested materials. *See* Doc. 73-1 at 2-3. In contrast to record completion, supplementation adds evidence to an otherwise complete record. *See WildEarth Guardians*, 713 F. Supp. 2d at 1253 n.5 (discussing the difference between supplementation and completion). Extra-record evidence is generally precluded in an administrative appeal. *Am. Mining Cong. v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985). Nevertheless, in some "extremely limited circumstances," the Court may supplement the record with such evidence. *Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1160 (10th Cir. 2022) (text only). The conditions warranting supplementation include:

> (1) [] the agency action is not adequately explained and cannot be reviewed properly without considering the cited materials; (2) [] the record is deficient because the agency ignored relevant factors it should have considered in making its decision; (3) [] the agency considered factors that were left out of the formal record; (4) [] the case is so complex and the record so unclear that the reviewing court needs more evidence to enable it to understand the issues; and (5) [] evidence coming into existence after the agency acted demonstrates that the actions were right or wrong.

*Am. Mining Cong.*, 772 F.2d at 626 (text only). The Court "may also delve outside the administrative record when there is a 'strong showing of bad faith or improper behavior.'" *Citizens for Alts. to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).

Plaintiffs argue that the record should be supplemented because ICE and Nakamoto destroyed evidence in bad faith. Doc. 73 at 20-24. They also seek relief under the first, second, and fifth *American Mining Congress* factors. *Id.* at 24-28. The Court addresses each argument in turn.

A.   **Bad Faith**

Plaintiffs argue that ICE acted in bad faith when it "ignored plain violations of the DMCP" by allowing Nakamoto to destroy records that should have been included in the inspection file for Torrance's follow-up review. *Id.* at 21.

As noted in this District, the standard for evaluating the requisite "strong showing" of bad faith or improper behavior necessary for record supplementation is ill-defined. *See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 305 F.R.D. 256, 291 (D.N.M. 2015) [hereinafter *Jarita Mesa*]. Judge James O. Browning's decision in *Jarita Mesa* did, however, articulate a workable framework that the Court deems applicable to the present facts. *See id.* at 291-92. First, Plaintiffs must proffer clear evidence to support the showing.[7] *Id.* Second, the applicable standard of proof demanded varies based on "the impact that the bad faith would likely have on the agency's [decision-making] process[.]" *Id.* at 292. Third, any supplementation must be narrowly tailored to "rectify the impact of bad faith on the administrative record." *Id.* The last element asks whether the "agency's bad faith caused [it] to omit from the record material that should be in the record." *Id.* at 292 n.14.

Applying this legal authority to the instant facts, Court finds that Plaintiffs have not proffered sufficient evidence to sustain their allegations that ICE and Nakamoto destroyed records

---

[7] The Court of Federal Claims has also reasoned that the "strong showing" for bad faith allegations requires an "evidentiary foundation" and must be "based upon hard facts." *Pitney Bowes Gov't Sols., Inc. v. United States*, 93 Fed. Cl. 327, 332 (2010) (text only).

10

in bad faith.[8] True enough, Nakamoto did not retain its records related to the December 2021 inspection and March 2022 follow-up review of Torrance's facilities. *See* Docs. 73-3 at 4; 77-1 at 8-9. But the focus of the bad faith inquiry is not on a third-party contractor, and instead examines the actions of the agency. *See Jarita Mesa*, 305 F.R.D. at 292 n.14. Plaintiffs have not shown that Burke, Wong, the acting DAD-OCAD, or any other federal Defendant acted in bad faith by withholding records from Nakamoto, destroying relevant documents, or otherwise altering the administrative record at the decision-making stage. To the extent Plaintiffs contend that Defendants did not comply with the DMCP, either by certifying Torrance without a full inspection file or by failing to demand Nakamoto's strict compliance with DMCP guidelines, those arguments go to the merits of Plaintiffs' claims. Resolution of those disputes is inappropriate at this juncture. *See id.* at 292 (noting that this type of argument "short-circuit[s] the appellate process, effectively allowing the appellant to argue the merits of the appeal outside of the normal procedural rules.").

      Furthermore, Plaintiffs have not shown that Nakamoto was required to retain the subject records in the first place. While the DMCP required the DAD-OCAD to retain Nakamoto's working papers as part of the required inspection file, Doc. 81-2 at 479-80, the DMCP did not control Nakamoto's conduct and document retention standards. Nakamoto's relationship with ICE was governed by a contract which required Nakamoto to carry out its inspections in accordance with the SOW. *Id.* at 556 (requiring that Nakamoto's work "will be based upon the Statement of Work for the specific effort"). The SOW, in turn, did not require Nakamoto to consider any of the materials Plaintiffs seek to add to the record. *See id.* at 512-13 (setting the mandatory information Nakamoto was required to utilize in its inspection process). The SOW also did not shoulder

---

[8] Lacking the requisite evidence, the Court cannot evaluate the second and third *Jarita Mesa* elements. Plaintiffs' argument fails at the outset.

11

Nakamoto with an obligation to submit all materials it produced or relied on during its inspections; the necessary documentation was instead cabined to specific forms, reports, and summaries. *See id.* at 516-17. Plaintiffs' allegations that Nakamoto destroyed its inspection records in bad faith are thus inapposite because nothing in the SOW required retention or submission of those records.

In sum, Plaintiffs have not shown that Defendants or Nakamoto acted in bad faith or improperly in generating the administrative record. Accordingly, the Court will not order supplementation on this basis.

**B.     First and Second *American Mining Congress* Factors: Adequate Explanation & Relevant Information**

Plaintiffs next argue that the record should be supplemented because Defendants disregarded pertinent information and did not sufficiently explain the decision to certify Torrance. Doc. 73 at 23. This argument springs from *American Mining Congress*'s first and second factors, which permit supplementation when the agency does not provide an adequate explanation or ignores relevant material that should have been considered in the decision-making process. *Am. Mining Cong.*, 772 F.2d at 626. Again, Plaintiffs must present "clear evidence" showing that the records they seek to add fit within these exceptions. *WildEarth Guardians v. U.S. Army Corps of Eng'rs*, 264 F. Supp. 3d 1136, 1142 (D.N.M. 2017). They also have the burden to show that the materials are relevant, in that they "'should have' been considered, and that the 'record is deficient' because the [materials were] not considered." *Id.* (citing *Am. Mining Cong.*, 772 F.2d at 626).

Plaintiffs' contention that Burke did not adequately explain her certification decision is conclusory and unsupported. Plaintiffs state that there is no explanation "beyond facile reliance on the inspection report, inspection worksheet, and Significant Incident Summary prepared by Nakamoto." Doc. 73 at 24. Plaintiffs do not point to any evidence supporting this conclusion other than the DMCP's requirement that the DAD-OCAD conduct a quality control review of the

12

inspection report. *Id.* There is no independent showing that the quality control review was omitted in this case. To the contrary, the acting DAD-OCAD concurred with Burke's assessment, providing a plausible inference that Nakamoto's inspection received the requisite quality assurance. *See* Doc. 81-2 at 893 (routing documentation signed by the acting DAD-OCAD with a "concur" box checked).

In any case, Plaintiffs neglect to mention that the documents in the record related to Burke's certification decision—Nakamoto's inspection report, worksheet (Form G-324A), and Significant Incident Summary—constitute over three hundred pages of material. *See id.* at 590-891. The inspection worksheet, which constitutes most of the documentation, provides granular detail on how Torrance satisfied the National Detention Standards during the inspection. *See id.* at 596-882. While Burke's certification memo lacks any explanation for her rationale, *id.* at 892, the pertinent segments of the current record provide evidence showing why she certified Torrance as compliant with the National Detention Standards. Consequently, Plaintiffs fail to show that Burke's decision is not adequately explained by the current record.[9]

Plaintiffs likewise fail to provide compelling evidence that Defendants ignored relevant material when making the final certification decision. The term "relevant" is narrowly construed in this context, with relevant material being that which should have been considered and without which renders the administrative record deficient. *U.S. Army Corp of Eng'rs*, 264 F. Supp. 3d at 1142. Plaintiffs contend that the OIG Materials and Contract Discrepancy Materials should have been included in Nakamoto's inspection file, Doc. 73 at 24-25, but offer no explanation for how their absence renders the existing record deficient. The administrative record contains extensive

---

[9] Plaintiffs also provide no authority requiring Burke or any other ICE employee to provide any explanation of the certification decision.

documentation laying out Nakamoto's findings. *See* Doc. 81-2 at 590-891. Those documents were compiled by Nakamoto during the inspection process and pursuant to its obligations under the SOW. And under the DMCP, Nakamoto's documentation under the SOW provided the material required to inform Burke's certification decision. *See* Doc. 81-2 at 486 (DMCP provision establishing that the "applicable form G-324 represents the bulk of the reporting requirements[,]" in addition to the inspection summary and assurance statement). Accordingly, Plaintiffs do not provide clear evidence that Defendants should have considered the OIG Materials and Contract Discrepancy Materials or that their absence renders the administrative record deficient.

### C.  Fifth *American Mining Congress* Factor: New Evidence Exception

Plaintiffs finally assert that the PREA Audit and the CRCL Materials, which post-dated Nakamoto's March 2022 follow-up review, should be added to the record as new information demonstrating that Burke's certification was wrong.[10] Doc. 73 at 26. Once again, Plaintiffs have a heavy burden, as this method of supplementation is only permitted in "extremely limited" circumstances. *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1027 n.1 (10th Cir. 2001) (citing *Am. Mining Cong.*, 772 F.2d at 626). As with the prior *American Mining Congress* factors, there is little pertinent decisional authority establishing how the fifth factor—the new evidence exception—should be applied.

One court in this Circuit has observed that the new evidence exception functionally evaluates the accuracy of an agency's predictions. *S. Utah Wilderness All. v. U.S. Bureau of Land Mgmt.*, Case No. 2:13-cv-01060, 2016 WL 6909037, at *2 (D. Utah Feb. 5, 2016) [hereinafter *SUWA*]. This reasoning stems from *American Petroleum Institute v. E.P.A.*, a pre-*American Mining*

---

[10] Plaintiffs do not request admission of the OIG Materials and Contract Discrepancy Materials under this argument. *See* Doc. 73 at 26-29; Doc. 80 at 16-18.

*Congress* case which held that "events indicating the truth or falsity of agency predictions" after an administrative decision "should not be ignored." 540 F.2d 1023, 1034 (10th Cir. 1976). The forward-looking nature of the new evidence exception is further supported by the text of *American Mining Congress*, which states that supplementation may be permitted when "evidence coming into existence after the agency acted demonstrates the actions were right or wrong." 772 F.2d at 626. This language contemplates agency action which has prospective effect—that sets in motion a new series of events which may be judged for their future effects, rather than evaluating a set of conditions at a discrete point in time.

*SUWA* and *American Petroleum Institute* provide contrasting applications of the rule. *American Petroleum Institute* examined Environmental Protection Agency regulations that required specific water filtration technology. 540 F.2d at 1034. The Tenth Circuit concluded that data collected following the promulgation of the regulation was relevant in determining whether the regulations had their intended effect. *Id.* Since the new data was pertinent to show the validity of the EPA's actions, it could be considered in a challenge to the regulations. *See id.* In contrast, *SUWA* excluded an extra-record study on ozone formation which provided contextual support for a Bureau of Land Management finding of no significant environmental impact related to well-drilling permits. *See* 2016 WL 6909037, at * 3. The relevant study only provided greater clarity on specific environmental conditions impacting the finding, rather than confirmation that there would be no significant impact arising from the subject drilling permits. *See id.* Though different in outcome, the determinative factor in both cases was whether the new evidence confirmed a prior decision with prospective effects.

Here, Burke's decision to certify Torrance was not forward-looking; she did not make any predictive judgments or otherwise utilize her authority to shape future inspections. Further, the

15

PREA Audit and the CRCL Materials had different evaluative priorities and did not confirm or disprove any prior anticipatory judgment. *See generally* Docs. 4-6 (PREA Audit Report); 73-11 (CRCL memorandum on April 19, 2022, spot-check at Torrance); 73-12 (CRCL memorandum on June 27-30, 2022, onsite investigation). Critically, Plaintiffs point to no evidence that either document considered Nakamoto's prior inspections at all. Neither the PREA Audit nor the CRCL Materials reference Nakamoto's follow-up report or Burke's certification. Accordingly, supplementation under the new evidence exception is not appropriate.

## CONCLUSION

While Plaintiffs have provided ample bases to be concerned about the conditions at Torrance, they have not shown that the administrative record is incomplete or that it should be supplemented with extra-record materials. Their Motion, Doc. 73, is therefore denied.

_____
UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA